IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 29645-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VICENTE RUIZ, AKA VICENTE | ) | OPINION PUBLISHED IN PART |
| MENDEZ, | ) | |
| | ) | |
| Appellant. | ) | |

KORSMO, C.J. — Five men were murdered in a Pasco garage in 1987 by two gunmen. One of the gunmen pleaded guilty and testified under oath at his plea hearing about how he and his cousin, appellant Vicente Ruiz,[1] committed the massacre. When Mr. Ruiz was apprehended and tried in 2010, his cousin refused to answer when questioned by the prosecutor consistent with his previous testimony. The primary contention in this appeal is whether the prosecutor erred in questioning the recalcitrant witness despite his refusal to answer. We conclude that this was permissible and affirm the convictions for five counts of aggravated[2] first degree murder and one count of attempted first degree murder.

---

[1] In the record, we note different spellings for Mr. Ruiz's first name. For the purposes of this opinion, we will use the spelling that appears on the information.

[2] The offense of aggravated murder consists of first degree intentional murder plus the presence of one or more statutory aggravating factors. RCW 10.95.020.

FACTS

The sole survivor of the shootings was Aldo Montes-Llamas[3] who was working with the other five men inside Medina's Body Shop on the evening of October 13, 1987. About 6:45 p.m., he saw two men arrive in a Mazda RX-7. The two men had contact outside the building with two mechanics; the mechanics then departed and the two men entered the shop. One of them was holding a .357 handgun in one hand and what appeared to be a .38 pistol in the other. The second man carried a chrome Mini 14 rifle. They rounded up the body shop workers and started shooting.

Mr. Montes-Llama dived under a car; a ricocheting bullet struck him in the abdomen. When the shooting ended, the two men went to their car and left; Mr. Montes-Llama drove himself to a police station and reported the shootings. An ambulance took him to the hospital while law enforcement descended upon the body shop.

Detective Henry Montelongo spoke to Montes-Llama at the hospital. He told the detective that the men were "Calentones" and mentioned the name "Vicente." The detective knew the Calentones as a branch of the Mendez family in Pasco. Meanwhile, the body shop owner, Clifford Medina, named Vicente Mendez (Ruiz) as a possible

---

[3] He used the false name of Jesse Rocio in 1987 and was referred to by that name in much of the trial proceedings. We use his correct name throughout this opinion.

2

suspect and told them Mendez was associated with a blue Camaro. Police began searching for a blue Camaro or RX-7.

A dark gray RX-7 was located at a Pasco apartment early in the morning of October 14. The apartment manager identified Vicente Ruiz as a renter of one of the apartments, but indicated he also lived at an apartment in Kennewick. A search warrant was served on the Pasco apartment and the RX-7. There was no one in the apartment, but police found male clothing, 22 bags of marijuana, and a single round of .223 ammunition. In the Mazda police found a receipt from Phil's Sporting Goods for .223 rifle ammunition purchased less than an hour before the shooting at the body shop. A fingerprint on a window belonged to Vicente Ruiz. A straw hat with a dark band and a bag of Oberto beef jerky were recovered from the Mazda. A convenience store manager later turned over a video showing two Hispanic teen males, one of whom was wearing a straw hat with a dark band, in her store purchasing Oberto beef jerky on the afternoon of the 13th.

Police showed Mr. Montes-Llama a photomontage; without hesitation he picked out Vicente Ruiz as one of the shooters. He identified Pedro Mendez-Reyna as the other shooter from a second montage. One of the mechanics also identified Ruiz in the photomontage, although at trial he did not recall doing so. The owner of the RX-7 told

3

Detective Montelongo that he had allowed Vicente Ruiz[4] to test drive the car on the afternoon of the shooting; Ruiz had loaned him a Toronado to use during the test drive.

The identified Kennewick apartment belonged to Ruiz's girl friend, Diana Garcia. She was pregnant with the couple's second child. A search of her apartment turned up documents[5] linked to Mr. Ruiz and an empty .38 caliber ammunition box. Garcia told police that Ruiz and Mendez-Reyna stopped at the apartment shortly after 7:00 p.m. on October 13. After that visit she had no contact with Ruiz until his arrest in 2007.

Forensic evidence showed that 14 shell casings recovered at the crime scene were Winchester .223 rounds fired from the same weapon. The other bullet fragments recovered at the scene came from either a .38 or a .357 magnum.

Pedro Mendez-Reyna was arrested in Texas in 1993. He was charged with five counts of aggravated first degree murder and one count of attempted first degree murder. In exchange for a guilty plea to the charged counts, the prosecutor agreed to forego the death penalty. Mr. Mendez-Reyna also testified extensively under oath at the plea hearing. His testimony on examination by his attorney detailed the killings and the

---

[4] The test driver used the name of "Oscar" during their interactions.
[5] These documents were suppressed and not used at trial.

4

actions of both he and Mr. Ruiz. The plea agreement did not require that Mendez-Reyna testify against Ruiz.

Mr. Ruiz was arrested in Mexico in 2007 and extradited to the United States. He told Detective Montelongo that he and his brothers had left Pasco in 1987 for a preplanned vacation in Mexico. At trial, the defense indicated that Mr. Ruiz had returned to Mexico to attend his sister's Quincenanera (15th birthday celebration).

Trial attempts in 2008 and 2010 ended in mistrials. The first mistrial was declared after the court granted a defense request for a continuance during jury selection in order to conduct deoxyribonucleic acid (DNA) testing. The second mistrial occurred after additional evidence was provided during trial testimony and the defense was granted additional time to investigate. Venue was changed to Spokane County for a third trial that commenced in November 2010.

Both parties listed Mr. Mendez-Reyna as a witness. During the second trial, the defense sought to prevent the State from calling Mendez-Reyna, arguing that he would assert his Fifth Amendment privilege. After the court denied that motion, the defense sought to limit questioning if Mr. Mendez-Reyna continued to assert the privilege despite the court's ruling. The parties extensively briefed and argued the issue. The trial judge concluded that the State would be permitted to ask its questions even if the witness

refused to answer. The defense was given a standing objection to "any and all questions" asked of Mendez-Reyna. Report of Proceedings (RP) at 2619.

The prosecution called Mr. Mendez-Reyna to testify. After the witness confirmed his name, the first substantive question the prosecutor asked was: "Referring to the defendant here in court today, second man from the wall; is that gentleman your first cousin?" Mr. Mendez-Reyna answered, "I plead the Fifth. *I don't know that man.*" RP at 2627 (emphasis added). The prosecutor then asked a series of additional leading questions and Mr. Mendez-Reyna gave an identical response each time, stating "I plead the Fifth." Each time, the court ordered him to answer the question and he refused. The following are the questions the prosecutor asked:

*Is the defendant, Vicente Ruiz, who is here in the courtroom today, is he your first cousin?
*Was your father and his mother brother and sister?
*I want to take you back to October 13, 1987. On that date were you residing in Seattle, Washington?
*On October 13th, 1987 were you visiting in Pasco, Washington?
*All right. Mr. Mendez-Reyna, on October 13th, 1987, did you have contact with the defendant, Vicente Ruiz, who you see here in the courtroom today in the City of Pasco, Washington?
*Did the defendant, Vicente Ruiz, ask your assistance in confronting six individuals with whom he had had a problem earlier in the day?
*Did you accompany the defendant, Vicente Ruiz, to a business called Phil's Sporting Goods in Pasco, Washington?
*Did you see ammunition being purchased at Phil's Sporting Goods for a Mini 14 rifle?

6

*After leaving Phil's Sporting Goods, did you get back into a motor vehicle with the defendant?

*Did you see that there were three firearms in the motor vehicle, a Mini 14 rifle, a .357 Magnum handgun and a .38 special handgun?

*After leaving Phil's Sporting Goods, did you and the defendant, Vicente Ruiz, proceed to Javier's Seafood Restaurant to look for the individuals?

*After not finding the individuals there, did you then go to Medina's Body Shop in Pasco, Washington?

*Did you encounter two individuals outside Medina's Body Shop who appeared to be mechanics?

*After the two mechanics had left, did you and the defendant, Vicente Ruiz, that you see here in the courtroom today, enter Medina's Body Shop carrying guns?

*Was the defendant, Vicente Ruiz, carrying two handguns and were you carrying the Mini 14 rifle?

*Once you were in the body shop, were all six individuals present rounded up and placed into one room?

*Did some argument ensue at that point?

*Did you see the defendant, Vicente Ruiz, open fire with the handguns he had in his possession?

*Did you also open fire with the Mini 14 rifle?

*Did you see individuals fall to the ground?

*Did you see any of the individuals in the body shop with firearms?

*Did all of the individuals fall to the ground as far as you could see?

*Did any of them appear to be moving?

*Did you check the individuals to see if they were still alive?

*Is it not correct none of the individuals, none of the individuals in the body shop, beside yourself and the defendant, had firearms that you could see?

*Did you then leave the body shop without checking the individuals?

*After leaving Medina's Body Shop on October 13, did you and the defendant, Vicente Ruiz, go first to Reno, Nevada, then to Los Angeles and then to Mexico?

*All right, Mr. Mendez-Reyna, take a look at the individual in the courtroom today, second man from the right, your cousin, Vicente Ruiz, was that the man who was with you on October 13th, 1987, and along with you, shot and killed those other men?

The defense did not attempt to question Mr. Mendez-Reyna.

The jury was not informed that Mr. Mendez-Reyna had been convicted of the murders and the prosecutor never addressed the topic of his trial testimony during closing argument. The court did give the jury instruction number 6, which provided:

> Questions asked a witness that go unanswered are not substantive evidence of any matter, to the extent a question may suggest a particular answer, it should not be considered by you as any proof of such matters.

Clerk's Papers (CP) at 53. The jury also was given the standard opening instruction that reminded them that what the lawyers say is not evidence and should not be considered as such. CP at 46.

The defense presented several theories at trial, with the primary one an attempt to portray Mr. Montes-Llamas as a shady character involved in drug-running through Medina's. He and the others were accused of deliberately or mistakenly misidentifying Mr. Ruiz as one of the killers. Additional evidence of misidentification and confusion was presented. The defense argued the case to the jury on the various misidentification theories.

Nonetheless, the jury convicted Mr. Ruiz as charged. On each count the jury unanimously found that the offenses were committed with the aggravating factor that there were multiple victims murdered as part of a common scheme or plan. As a result of

8

the verdicts, the court sentenced Mr. Ruiz to life in prison without possibility of parole.

He then timely appealed to this court.

ARGUMENT

Mr. Ruiz presents three claims in this appeal. He primarily argues that it was error for the court to call and the prosecutor to question Mr. Mendez-Reyna in light of the refusal to answer. He also argues that the court deprived him of a defense by not allowing identification evidence from a deceased witness and that it was error for his prior misdemeanor arrest to get before the jury.[6] We address the first claim in the published portion of this opinion and consider his other claims in the unpublished portion.

---

[6] He also argues that the cumulative effect of these errors deprived him of a fair trial. In light of our assessment of the three arguments, we do not address that claim.

*Mendez-Reyna Testimony.* Mr. Ruiz argues that the trial court erred in permitting Mr. Mendez-Reyna to take the stand in light of his assertion of the Fifth Amendment and that the prosecutor committed misconduct in questioning him. We treat his arguments as two sides of the same coin and conclude that the court correctly required the witness to testify and that the prosecutor had a good faith basis for asking each question. There was no error.

While Washington courts have not yet addressed the specific questions presented by Mr. Ruiz, we do believe that some basic principles inform our review. Trial court rulings relating to the admission of evidence are reviewed for abuse of discretion. *State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

*Calling Mr. Mendez-Reyna to the Stand.* The common law has long recognized a duty to testify. The United States Supreme Court once summarized the history of that obligation:

> The power of government to compel persons to testify in court or before grand juries and other governmental agencies is firmly established in Anglo-American jurisprudence. The power with respect to courts was established by statute in England as early as 1562, and Lord Bacon observed in 1612 that all subjects owed the King their "knowledge and

10

discovery." While it is not clear when grand juries first resorted to compulsory process to secure the attendance and testimony of witnesses, the general common-law principle that "the public has a right to every man's evidence" was considered an "indubitable certainty" that "cannot be denied" by 1742. The power to compel testimony, and the corresponding duty to testify, are recognized in the Sixth Amendment requirements that an accused be confronted with the witnesses against him and have compulsory process for obtaining witnesses in his favor.

*Kastigar v. United States*, 406 U.S. 441, 443-44, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972)

(footnotes omitted).

Washington similarly recognizes an obligation of a witness to testify. *E.g.*, *State v. Parker*, 79 Wn.2d 326, 331, 485 P.2d 60 (1971);[7] *State v. Green*, 71 Wn.2d 372, 378, 428 P.2d 540 (1967).[8] Statutes confirm that obligation. RCW 5.56.010; RCW

---

[7] "Every person within the jurisdiction of a court of competent jurisdiction—with a few exceptions related to the office of the chief executive—owes a duty when summoned by the court to come forward and speak the truth. It is a duty which may be enforced by imprisonment, fine and the imposition of other judicial sanctions. Without the power to compel witnesses to testify, trials would be reduced from a quest for the truth in the most momentous affairs of life to pointless and inconclusive debates and the judicial systems would face inevitable extinction." *Parker*, 79 Wn.2d at 331.

[8] "One of the basic obligations resting on everyone living under the protection of our constitutions is that, when called upon to give evidence in court he will, without reservation, speak the truth; that he will not avoid or evade this duty through fear, malice, or hope or promise of reward. The court and every party to a judicial proceeding—indeed, society itself—has a right to assume that the duty to give truthful evidence will be discharged and it need not be anticipated that that duty will be betrayed." *Green*, 71 Wn.2d at 378.

11

7.21.010(1)(c); RCW 10.52.040. Courts typically use the contempt power to address a refusal to testify. RCW 5.56.061; ch. 7.21 RCW.

The primary exception to the obligation to testify is the Fifth Amendment's privilege against compulsory self-incrimination. *Kastigar*, 406 U.S. at 444. The privilege can be asserted on a blanket basis by a criminal defendant. *State v. Dictado*, 102 Wn.2d 277, 293, 687 P.2d 172 (1984); *State v. Lougin*, 50 Wn. App. 376, 381, 749 P.2d 173 (1988). In most other instances, however, it must be asserted on a question by question basis. *State v. Levy*, 156 Wn.2d 709, 732, 132 P.3d 1076 (2006); *Lougin*, 50 Wn. App. at 381 ("In general, a claim of privilege may be raised only against specific questions, and not as a blanket foreclosure of testimony."). When a person has been convicted of a crime and there is no longer any possibility of appeal, the Fifth Amendment privilege no longer exists because there is no potential jeopardy for testifying. *State v. Barone*, 329 Or. 210, 231, 986 P.2d 5 (1999), *cert. denied*, 528 U.S. 1086 (2000); 1 McCORMICK ON EVIDENCE § 121 at 527 (Kenneth S. Broun ed., 6th ed. 2006) (absent some specific showing that collateral attack is likely to succeed, most courts treat finality of conviction as unqualifiedly removing the risk of incrimination).

It is the duty of the trial judge to determine if privileged information is sought. *Parker*, 79 Wn.2d at 332 (citing *Hoffman v. United States*, 341 U.S. 479, 71 S. Ct. 814,

12

95 L. Ed 1118 (1951)). A judge's decision in this area is reviewed for abuse of discretion. *Id.* Against this backdrop, the parties do not contest that Mr. Mendez-Reyna did not have a valid Fifth Amendment protection against self-incrimination. He did not appeal his sentence, which thus became final in 1994. RCW 10.73.090(3)(a). As there was no basis for claiming the protections of the Fifth Amendment, the trial court did not err by allowing the State to call Mr. Mendez-Reyna to the stand.

Nonetheless, Mr. Ruiz contends that Washington does not allow a witness to be called if she or he is going to assert a privilege. He relies upon *State v. Nelson*, 72 Wn.2d 269, 432 P.2d 857 (1967). *Nelson* is easily distinguishable. There a codefendant, Patrick, who had pleaded guilty to a lesser murder charge validly asserted his Fifth Amendment privilege "to all questions relating to the events of the night in question." *Id.* at 277. The privilege was valid because Patrick was still subject to possible prosecution on related charges from the incident. *Id.* Patrick had claimed the privilege in a previous trial and asserted prior to this trial that he would do so again. *Id.*

The prosecutor called Patrick to the stand and he answered some questions unrelated to the night in question, but asserted the privilege in front of the jury on 28

13

questions concerning the murder. *Id.* The plurality opinion[9] concluded that the questioning of Patrick constituted a violation of Nelson's confrontation right. *Id.* at 285. The critical fifth vote came from the concurring opinion of Justice Hill, who considered the prosecutor's actions to be a prejudicial trial tactic. *Id.* at 286. "However, I want to make it clear that I am, by my concurrence, not committing myself to the same conclusion under the same circumstances should this case again reach this court." *Id.* Noting that the statute of limitations had now run, Patrick could not claim the privilege at a retrial. "A witness cannot invoke the Fifth Amendment merely to protect another from punishment." *Id.*

Mr. Ruiz's case is not the same as Mr. Nelson's case. Unlike *Nelson*, Mr. Mendez-Reyna had no valid privilege he could assert. This fact is critical due to the nature of the problem presented when a privilege is exercised in front of a jury. Washington has long rejected the practice of forcing a witness to invoke a privilege, whether constitutional or statutory, in front of the jury. *State v. Charlton*, 90 Wn.2d 657, 585 P.2d 142 (1978) (spousal privilege); *State v. Jackson*, 83 Wash. 514, 516, 145 P. 470 (1915) (self-incrimination). The basis for that "is that the State cannot and will not be

---

[9] Three justices signed the opinion and a fourth justice concurred in the result. *Nelson*, 72 Wn.2d at 285.

permitted to put forward an inference of guilt, which necessarily flows from an imputation that the accused has suppressed or is withholding evidence, when by statute or constitution he simply is not compelled to produce the evidence." *Charlton*, 90 Wn.2d at 662. The government may not change the shield of protective privilege into an evidentiary sword.

The problem of a criminal defendant appearing to block evidence is not presented when a witness refuses to testify or asserts a nonexistent privilege. Rather, the issue is one of the witness attempting to shelter the defendant by refusing to testify. The Oregon Supreme Court has spoken to that problem:

> Viewed realistically, a refusal to testify by an already convicted accomplice cannot stem from his desire to protect himself and must, therefore, stem from his desire to protect the defendant. The defendant cannot complain if the jury chooses to draw the logical inference that a truthful answer would have implicated defendant. This being the logical inference, we see no reason for not permitting the prosecutor to present the matter to the jury through the device of calling a convicted accomplice who the prosecutor knows will make the inference possibly by the witness remaining silent.

*State v. Abbott*, 275 Or. 611, 616, 552 P.2d 238 (1976) (footnote omitted).

The same issue is presented if a witness, rather than asserting a nonexistent privilege, simply declined to answer a question or a series of questions. The State is not attempting to exploit a privilege, but, rather, is attempting to gain evidence from a

15

witness who has no legal basis to decline to provide the information. The inference to be drawn from a refusal to answer is that the witness is protecting someone, not that the inquiry is substantive evidence of fact. *Id.* That inference comes from the actions of the witness, not the actions of the court in permitting the testimony or of the prosecutor for soliciting it. Thus, there is no violation of the Fifth Amendment because there was no privilege being exploited.

Questioning a privileged witness also implicates the Sixth Amendment right to confront witnesses. The United States Supreme Court has recognized that asking a series of questions of a witness who asserts his self-incrimination privilege puts the defense in the position of being unable to cross-examine the witness, thus violating the Sixth Amendment. *Douglas v. Alabama*, 380 U.S. 415, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965). The *Nelson* plurality recognized the same fact. 72 Wn.2d at 285.

We do not see that this problem exists when the witness does not have a valid privilege. Since the witness cannot refuse to answer, there was no reason that the defense cannot ask leading questions of the witness. Indeed, as a matter of tactics, if the recalcitrant witness wrongly asserted the privilege on cross-examination, the defense would be free to point this fact out and argue that the witness was actually protecting someone else. In the present case, however, counsel for Mr. Ruiz understandably would

16

not want to question Mr. Mendez-Reyna lest he actually answer a question contrary to the previous testimony and permit the prosecutor to enter that testimony as substantive evidence of guilt. Defense counsel reasonably stayed away from questioning Mendez-Reyna, although they could have done so.

In both *Abbott* and *Barone*, the Oregon Supreme Court faced situations where witnesses in each case had wrongly refused to answer questions put to them by the respective prosecutors. In each instance, the court concluded that it was not error for the witness to be called and questioned. *Barone*, 329 Or. at 232; *Abbott*, 275 Or. at 616. The trial court relied upon *Barone* in permitting Mr. Mendez-Reyna to be called to the stand. In the absence of contrary Washington authority, the trial court's reliance upon the Oregon authority was a tenable ground for permitting the testimony.

For all three reasons—no privilege existed, confrontation was possible, and tenable grounds existed for permitting the testimony—the trial court did not err by overruling the defense objection to having Mr. Mendez-Reyna testify for the prosecution.[10] We also note that on policy grounds, the court correctly ordered Mr. Mendez-Reyna to take the stand. A refusal to obey a court order and provide truthful

---

[10] We do not consider whether the fact that Mr. Mendez-Reyna was also listed as a defense witness would waive the defense objection.

17

unprivileged testimony should not, except in the most unusual circumstances, be a basis

for excusing a prospective witness. The judge, not the witness, is in control of the trial.

It is difficult to understand how a court can in good conscience assert its authority only

over the law abiding if it declines to assert its authority over those who pay it no heed.

The duty all citizens owe to provide information to the court cannot rest solely in the

hands of the witness less the courts become nothing other than a voluntary dispute

resolution system of little value to anyone.[11]

Neither the court nor the parties could realistically compel Mr. Mendez-Reyna to

testify truthfully given his sentence. However, that fact does not mean that the court was

required to abandon its effort to have him testify truthfully.

The trial court did not err in denying the motion to exclude Mr. Mendez-Reyna's

testimony.

*Questioning Mr. Mendez-Reyna.* Mr. Ruiz also takes issue with the prosecutor's

decision to call and question Mr. Mendez-Reyna to the stand in light of his anticipated

refusal to testify. While much of this argument was answered in our previous discussion,

---

[11] The *Parker* court put the issue more starkly, "Without the power to compel witnesses to testify, trials would be reduced from a quest for the truth in the most momentous affairs of life to pointless and inconclusive debates and the judicial systems would face inevitable extinction." 79 Wn.2d at 331.

18

a few additional points do need to be addressed. The prosecutor did not commit misconduct in calling a witness to the stand who had no privilege and had previously provided evidence under oath; there was a factual basis in the trial record for nearly every question asked by the prosecutor.

Several well-settled standards govern this argument. "A person being tried on a criminal charge can be convicted only by evidence, not by innuendo." *State v. Yoakum*, 37 Wn.2d 137, 144, 222 P.2d 181 (1950). It is reversible error when the prosecutor "makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Nelson*, 72 Wn.2d at 280 (quoting *Namet v. United States*, 373 U.S. 179, 186, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963)); *see State v. Carlisle*, 73 Wn. App. 678, 680-81, 871 P.2d 174 (1994). It also is error to question a witness in a manner that suggests evidence exists outside of the record that has been provided to the jury. "Counsel is not permitted to impart to the jury his or her own personal knowledge about an issue in the case under the guise of either direct or cross-examination when such information is not otherwise admitted as evidence." *State v. Denton*, 58 Wn. App. 251, 257, 792 P.2d 537 (1990).

When a prosecutor's questions imply the existence of a prejudicial fact, the prosecutor must be able to prove that fact. *State v. Miles*, 139 Wn. App. 879, 886, 162

19

P.3d 1169 (2007). Failure to do so may be prejudicial misconduct. *Id.* at 887. The reason is "not because the facts are inadmissible, but because no witness is willing and available to testify as to those facts." *Id.* at 888 (quoting 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW & PRACTICE § 103.22 at 96 (4th ed.1999)). As the *Miles* court further explained, the focus must be on whether the prosecutor is imparting his own knowledge without testifying. *Id.* at 887.

A defendant claiming prosecutorial misconduct must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. *Id.* at 885. Prejudice exists if there is a substantial likelihood that the misconduct affected the verdict. *Id.* We do not believe Mr. Ruiz has shown either error or harm.

Initially, we reiterate that since Mr. Mendez-Reyna had no valid privilege to claim, it was proper for the prosecutor to call him to the stand to see if he would in fact honor his obligation under the law to answer questions. Unlike the error in *Nelson*, where the witness was privileged not to testify, Mr. Mendez-Reyna had no privilege and was obligated to testify. The prosecutor did not err in seeking his information.

That does not mean that the questioning itself was proper. Mr. Ruiz strenuously argues that the repeated questioning in light of Mr. Mendez-Reyna's refusal to answer

20

amounted to trial by innuendo. We have carefully reviewed the record and disagree. With the exception of two questions of little import, there was either a factual basis for each question in the trial record, or the question was a reasonable inference based on trial testimony.

The sole exceptions were the questions "Did the defendant, Vicente Ruiz, ask your assistance in confronting six individuals with whom he had a problem earlier in the day?" and "After leaving Medina's Body Shop on October 13, 1987, did you and the defendant, Vicente Ruiz, go first to Reno, Nevada, then to Los Angeles and then to Mexico?" The first question actually was backed by testimony from Ms. Garcia. However, that testimony had been admitted solely for impeachment purposes and was not substantive evidence. The second question was not fully supported by the record. Although there was significant evidence of Mr. Ruiz's flight (he had abandoned all of his possessions in his apartment as well as his pregnant girl friend and their son, never to see any of them for 20 years before his capture in Mexico), there was no substantive evidence that Mr. Mendez-Reyna accompanied him on his travels.

Although not supported by the substantive evidence, the first question is not significant because the State's case was not built around any motive theory. The other question had partial support in the record (and the inferences therefrom), but whether or

21

not Mr. Mendez-Reyna accompanied Mr. Ruiz on his flight was simply not significant to the case. In light of these facts, we do not believe that the two questions were so far off the mark as to make them improper.

We likewise do not believe that the questions were improperly prejudicial. The questioning did not suggest that the prosecutor had additional evidence that the jury had not seen. The prosecutor also did not argue Mr. Mendez-Reyna's testimony in closing argument or otherwise stress it. The jury also was instructed that nonanswers were not substantive evidence and should not be treated as such. Mr. Mendez-Reyna's testimony did not amount to a significant factor in this case; unlike *Nelson*, it did not give critical weight to a weak case. *Nelson*, 72 Wn.2d at 285. Instead, it was a small part of a strong State's case. In similar circumstances, our court has concluded that no prejudicial error resulted. *See Dictado*, 102 Wn.2d at 295-96 (privilege asserted extensively in redirect examination not prejudicial error); *Parker*, 79 Wn.2d at 331 (defense witness claimed privilege 12 times before the jury). Mr. Ruiz likewise was not prejudiced by the

22

testimony.[12]  Because he has not shown error or prejudice, Mr. Ruiz has not established a

basis for relief.

That does not necessarily mean that we approve of the extended questioning that

took place here.  The final 28 questions all met with the same response—Mr. Mendez-

Reyna was refusing to answer.  Although the jury was told not to consider the substance

of the questions as evidence (unlike what occurred in the cases relied upon by Mr. Ruiz),

the jury was permitted to conclude that the witness was protecting someone, probably

Mr. Ruiz.  While we believe it was fair to permit the questioning and this inference, it

does not mean that the jury needed to hear the same answer 28 times.[13]  Also, laying out

the State's theory of the case in questioning, as opposed to closing argument, was

argumentative.  Repetitive and argumentative questions are subject to restriction under

ER 403.  At no time during the questioning of Mr. Mendez-Reyna did defense counsel

object to the cumulative nature of the assertion of privilege.  Counsel had sought to

---

[12] In other cases, error relating to the timing of the assertion of the privilege has been found harmless beyond a reasonable doubt. *See Levy*, 156 Wn.2d at 732-33; *Lougin*, 50 Wn. App. at 382.

[13] In *Barone*, the privilege was asserted on only four questions. *Barone*, 329 Or. at 230.  In *Abbott*, the witness refused to answer one question and then engaged in a brief exchange with the prosecutor about why he was not answering. *Abbott*, 275 Or. at 614.

exclude the testimony entirely on Fifth and Sixth Amendment grounds, and had received

a standing objection to any and all questions on that basis.

The failure to raise an evidentiary objection to the trial court waives the objection.

*State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985); *State v. Boast*, 87 Wn.2d 447,

451-52, 553 P.2d 1322 (1976). As explained in *Guloy*:

> A party may only assign error in the appellate court on the specific ground
> of the evidentiary objection made at trial. Since the specific objection made
> at trial is not the basis the defendants are arguing before this court, they
> have lost their opportunity for review.

*Guloy*, 104 Wn.2d at 422 (citation omitted).

The defense did not present an ER 403 argument at trial and accordingly no relief

is available on appeal, but we note this issue in the event a similar case should arise in the

future.[14] Whether after the third or the twenty-third question, there probably was a point

where the trial court, in its discretion, could determine that nothing new was being

accomplished by the questioning and that the witness would not change his mind. Even

though he had responded to the first two questions, at some point it was clear that Mr.

Mendez-Reyna was not going to change his mind and answer any more questions,

although exactly when that point was reached cannot be determined from a cold record.

---

[14] In light of our conclusion that prejudicial error was not established, the failure to raise an evidentiary objection does not amount to ineffective assistance of counsel.

24

If the defense thought that point was reached in the questioning, it could have raised the issue with the trial court, at sidebar if necessary to protect against appearing to be in cahoots with Mr. Mendez-Reyna's behavior.

We conclude that Mr. Ruiz has not established prejudicial error from the questioning of the recalcitrant witness in this case. The case was well and fairly tried by veteran counsel on both sides. It was hard fought consistent with the serious nature of the charges. Seeing no significant error, we affirm the convictions.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.

*Presentation of Defense.* Mr. Ruiz next argues that the trial court violated his right to present a defense by excluding evidence that a deceased sporting goods store owner had identified Mr. Ruiz's brother, Antonio Mendez, as one of the purchasers of the ammunition used in the killings. The trial court did not err and, even if it had, any error was harmless beyond a reasonable doubt.

Phil Van Hoy, then owner of Phil's Sporting Goods, was shown two montages to see if he could identify the purchasers of the ammunition that the receipt in the RX-7 indicated had come from his store. Mr. Van Hoy had identified Antonio Mendez, brother

to Mr. Ruiz, as one of the two young men. When shown the other montage, Mr. Van Hoy "just wasn't sure" if Mr. Ruiz was the other. Mr. Van Hoy died before trial. The court excluded his identification as hearsay under ER 801(d)(1)(iii).

ER 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is generally inadmissible unless there is an applicable exception. ER 802. ER 801(d)(1)(iii) provides that a statement "of identification of a person made after perceiving the person" is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination.

There is no dispute that the Van Hoy identification evidence had some relevance under ER 401 to a defense theory that Ruiz may have been mistaken for Antonio Mendez as one of the shooters. Even so, the evidence was not admissible under ER 801(d)(1)(iii) because Van Hoy was deceased at the time of trial and no other hearsay exception applied. *See State v. Grover*, 55 Wn. App. 923, 933-34, 780 P.2d 901 (1989) (identifier must testify at trial even when identification statement introduced through another witness); 5B KARL B. TEGLUND, WASHINGTON PRACTICE: EVIDENCE LAW & PRACTICE § 801.29, at 382-83 (5th ed. 2007) (if identifying witness has died, the prior out-of-court identification would remain inadmissible unless it falls within some other hearsay

26

exception or can be classified as nonhearsay). The ruling excluding the Van Hoy

identification evidence was not an abuse of discretion under our evidentiary rules.

Recognizing that the rule excluded the identification by the late Mr. Van Hoy, Mr.

Ruiz argues that the mechanical application of the hearsay rule is inconsistent with the

purpose of the rule and also violates his constitutional right to present a defense. Because

of his right to present a defense, he argues that under *Holmes v. South Carolina*, 547 U.S.

319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006), state evidentiary rules must give way to

his constitutional right.[15] We have not viewed *Holmes* so expansively. *State v. Hilton*,

164 Wn. App. 81, 101-02, 261 P.3d 683 (2011). However, we need not revisit *Holmes*

because Mr. Ruiz has not established that his right to present a defense was violated.

Mr. Ruiz argues that since the purposes of the hearsay rule are to ensure reliability

and protect the right to confrontation,[16] the hearsay rule should give way here since the

parties both agree what Mr. Van Hoy said and since his right of confrontation would not

be offended by evidence he was offering. The State responds that it is equally entitled to

ensure information at trial is reliable. It contends that because it was deprived of the

---

[15] In *Holmes*, a South Carolina rule excluded defense third party perpetrator evidence when the State's case was forensically strong. 547 U.S. at 323. By prohibiting the defense theory of the case, the state rule violated the constitution. *Id.* at 328.
[16] *State v. Chapin*, 118 Wn.2d 681, 685-86, 826 P.2d 194 (1992).

ability to question Mr. Van Hoy concerning both the reliability of his identification and

Mr. Mendez-Reyna's prior testimony that he and Mr. Ruiz were the two who made the

purchase, it would be unreliable to admit the identification.[17] In other words, the State's

focus is on the reliability of Mr. Van Hoy's identification while Mr. Ruiz's focus is on

the police report about that identification. We are not convinced that Mr. Van Hoy's

identification was so reliable that the constitution required the hearsay rule to be

overridden in this circumstance.

Nonetheless, we do not believe admission of the evidence would have disrupted

the truth-seeking function to the prejudice of the State. While the identification of Mr.

Mendez as one of the purchasers would have been harmful to the State, it was still free to

develop the fact that Mr. Van Hoy was uncertain of Mr. Ruiz's presence and could not

rule it out. Evidence that Antonio Mendez and Mr. Ruiz looked similar, and that Mr.

Ruiz rather than Antonio Mendez was driving the RX-7 that contained the sales receipt,

made it quite easy for the State to argue that Mr. Van Hoy was mistaken. Under these

facts, we believe the trial court could have admitted the Van Hoy identification despite

---

[17] The State also argues it is patently unfair to allow the Van Hoy identification evidence where it cannot offer Mendez-Reyna's testimony indicating that he and Mr. Ruiz were the purchasers. However, that problem arises from a different circumstance and is not a basis for excluding Van Hoy's identification on some sort of a tit-for-tat theory. The two issues are distinct.

28

ER 801(d)(1)(iii) due to lack of significant prejudice to the State. However, it was not required to do so.

But, even if there was constitutional error, it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). While useful to the defense, the Van Hoy identification was not so significant that it was error to exclude it, particularly in light of the other testimony that the defense was able to use to argue its theory of the case. There also was no evidence putting Antonio Mendez at the shooting or in the getaway vehicle. He, unlike Mr. Ruiz and Mr. Mendez-Reyna, did not flee the area never to voluntarily return. As there was no evidence linking Antonio Mendez to the crimes, there was no reason to believe that Mr. Van Hoy's identification would have added significant information to the case.

As previously discussed, the direct and circumstantial evidence that Ruiz went to Medina's Body shop in the Mazda RX-7 loaned to him on October 13 and participated in the homicides is very strong. That evidence of guilt is further bolstered by Ruiz's leaving his personal belongings, pregnant girl friend, and their child behind to immediately flee to Mexico and avoid prosecution for 20 years. Admission of Van Hoy's statements that Antonio Mendez was present when the ammunition was purchased, but that he was not sure about Ruiz, undoubtedly would not have changed the trial outcome.

29

The court did not err in excluding the evidence, nor did the ruling prejudicially affect the defense case. Any error was harmless beyond a reasonable doubt.

*ER 404(b)*. Mr. Ruiz also contends that he was harmed by the admission of evidence that he had been arrested for a misdemeanor traffic offense four years before the murder. The court did not abuse its discretion in admitting information about the source of the defendant's fingerprints.

Mr. Ruiz had been arrested for driving under the influence in late 1983. He was fingerprinted at that time and a booking photo also was taken. The fingerprints were used for comparison when he was returned to Franklin County in 2007 and to identify the print found in the RX-7. The booking photo was used for the photomontages shown to witnesses in 1987. Reference was made to the source of these two items by investigators and technicians called to explain fingerprint comparisons or montages shown to the witnesses. The original 1983 arresting officer testified that he had arrested Mr. Ruiz following a traffic stop.

The defense sought to exclude the information under ER 403 as prejudicial character evidence that showed criminal propensity. The trial court found that the probative value of the evidence outweighed its prejudicial impact, particularly in view of

30

the fact that the defense had put identity in issue in its opening statement. The court

excluded testimony about the basis of the 1983 traffic arrest.

The purpose of ER 404(b) is to exclude evidence that suggests that one is a

"criminal type" who was acting in accordance with that propensity. *State v. Lough*, 125

Wn.2d 847, 853, 889 P.2d 487 (1995). ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the
> character of a person in order to show action in conformity therewith. It
> may, however, be admissible for other purposes, such as proof of motive,
> opportunity, intent, preparation, plan, knowledge, identity, or absence of
> mistake or accident.

In other words, the rule prohibits admitting evidence to show a person's character to

prove the person acted in conformity with that character on a particular occasion. *State v.*

*Everybodytalksabout*, 145 Wn.2d 456, 466, 39 P.3d 294 (2002).

Mr. Ruiz correctly argues that the testimony that he was arrested and booked into

jail raises ER 404(b) concerns. *State v. Acosta*, 123 Wn. App. 424, 433, 98 P.3d 503

(2004). The question then becomes whether the trial court correctly struck its balance in

weighing the probative value of the evidence against its prejudicial impact. The principle

issue in the case was the identity of the second gunman. Thus, the foundation of the

State's physical evidence of identity was an important aspect of the case. It was

necessary for the witnesses to tie the fingerprints examined or the photographs displayed

31

to the defendant, Mr. Ruiz, and they did that through the initial arrest records. Given the significance of the evidence, the trial court had a tenable basis for concluding that the probative value of that information outweighed any prejudicial impact the prior arrest might have had.

The evidence also was not overplayed at trial. The circumstances of the arrest were not placed in evidence and the information was never used to show or argue that Mr. Ruiz had a general criminal propensity or character. Instead, it was simply mentioned in passing as the source of the materials—something a reasonable juror would probably have concluded anyway from the existence of the records. Being told that the arrest was for a "traffic stop" was probably the least prejudicial manner of conveying the information. The brief mention of the 1983 arrest was not unduly prejudicial information in light of its foundational importance to the significant physical evidence.

There was no abuse of discretion.

Affirmed.

Korsmo, C.J.

WE CONCUR:

Kulik, J.

Siddoway, J.

32