2015 MAR -9 AM 11: 2


# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON<br><br>          Respondent,<br><br>     v.<br><br>KARINA TORRESCANO-HERNANDEZ,<br><br>          Appellant. | No. 70546-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: <u>March 9, 2015</u> |

SPEARMAN, C.J. — Based on allegations that Karina Torrescano-Hernandez punished her six-year-old son, C.T., by burning his hands on a stove, the State charged her with second degree assault with deliberate cruelty. At trial, the court admitted evidence concerning a whip mark on C.T.'s leg to explain C.T.'s inconsistent and delayed reporting of his burns. The jury acquitted Torrescano-Hernandez of intentional assault and deliberate cruelty but convicted her of assault by criminal negligence. Torrescano-Hernandez appeals, arguing in part that the court abused its discretion in admitting the whip mark evidence. Because the court did not abuse its discretion, and because Torrescano-Hernandez's other claims on appeal lack merit, we affirm.

## FACTS

During pretrial proceedings, counsel informed the court that Dr. Kenneth Feldman, a pediatrician and child abuse consultant, had determined that a "U-shaped hyperpigmentation" on C.T.'s thigh was caused by whipping with a looped cord. Clerk's Papers (CP) at 140. Because the age and perpetrator of the injury were unknown, defense counsel moved to exclude testimony regarding the

whip mark. The court then asked how the prosecutor planned to deal "with the issue of who did it[.]" Verbatim Report of Proceedings (VRP) at 418. The prosecutor responded:

> I think whether or not . . . the defendant did it, or whether [C.T.]'s grandmother did it, I think it's relevant nonetheless because . . . whipping with a looped cord is in that upper level extreme physical discipline category that would have an effect on the child even if it was delivered from a grandmother as opposed to a mother. VRP at 418.

The court reserved the ruling.

At trial, the evidence established that Torrescano-Hernandez has two children, C.T. and N.H. C.T. was born in Mexico in 2006 and lived there with his grandparents from age one until his mother brought him to Washington at age four.

In September 2012, Torrescano-Hernandez worked nightshifts at a fast food restaurant. Maria Del Carmen Hernandez babysat C.T. and N.H. while she was at work. On September 13 or 14, 2012, Hernandez's teenage daughter, M.D., noticed that C.T. was hiding his hands under a blanket. When she pulled the blanket away, she noticed brown spots on his hands that were covered in ointment. C.T. told M.D. he injured his hands on the monkey bars. Either C.T. or N.H. said something about burning marshmallows on the stove. M.D. asked N.H. to leave the room.

M.D. testified that after N.H. left, C.T. started crying and said his mother burned his hands on the stove. He asked M.D. not to tell anyone.

Hernandez testified that M.D. came into her room that evening and told her about C.T.'s hands. Hernandez looked at the burns and asked C.T. what happened. He did not respond. C.T. was struggling and "twisting his tongue" in his mouth. VRP at 561. Hernandez asked if he hurt his hands on the monkey bars. He nodded

affirmatively. Hernandez testified that she did not believe the monkey bars caused the injury, but she asked the question because she could tell C.T. was suffering.

Over the next several days, Hernandez's daughter A.C.H. told a classmate about C.T.'s injuries and Hernandez asked Torrescano-Hernandez about them. Torrescano-Hernandez told Hernandez that C.T. burned himself "doing some candies." VRP at 569. Weeks later, after C.T. had been interviewed by school officials and health care providers, he told Hernandez that his mother burned his hands. He demonstrated how she put both of his hands on the stove twice and said "[d]on't do that again." VRP at 581.

In late September, Meredith Alt, a counselor at C.T.'s school, asked C.T. about his injuries. He "became upset and began crying." VRP at 772. He gave "varying stories" about the injuries. VRP at 772. At one point he said he had been throwing hot wood chips at the school, but later he said he was injured at the park.

Social worker Janell Berger interviewed C.T. the same day. When she asked to see his hands, he "showed them quickly and put them back in his lap." VRP at 836. Berger asked him how the injuries happened, but "[h]e wouldn't say anything." VRP at 836. C.T. "eventually put his head down and just started to cry." Id. Over the next ten minutes, Berger tried various ways to engage C.T. in conversation, but he continued to cry and would not talk.

Seattle Police Officer Elizabeth Wareing testified that she talked briefly to C.T. after Janell Berger. She asked if he was with someone or by himself at the time of the injuries, and he said he was by himself. When she asked how it happened, he did not respond. Wareing also interviewed Torrescano-Hernandez at her

apartment. She showed Wareing some skewers from the kitchen but could not find any marshmallows.

Several days after Alt, Berger, and Wareing interviewed C.T., Child Protective Services (CPS) representatives came to his school to take him and his brother into custody. C.T.'s teacher, Laurie Davis, brought C.T. to the office and told him "[y]our mom made a mistake when she hurt you. She should not have done that [.]" VRP 807. Davis also told C.T. "Mommy needs help." VRP at 802.

On September 28, 2012, physician's assistant Janell Ibsen examined C.T. When she asked about his hands, "[h]e said that he . . . had been accused of taking someone's iPod, and that his mom had gotten extremely angry with him, and as a result, took his hands and burned them on a stovetop." VRP at 752-53. Ibsen noticed other marks on C.T. and asked if his mother or anyone else had done other things to him. C.T. said his mom had hit him with a shoe and a spoon and had also pinched him.

Ibsen noticed an area of hyperpigmentation on C.T.'s thigh. She characterized it as "scarring . . . that had been left from some sort of trauma." VRP at 756. She asked C.T. what the marks were from. He said, "Oh, I've been hit by a few things." VRP at 755. Ibsen recommended that C.T. be examined by someone at Children's Hospital.

On October 2, 2012, child interview specialist Gina Coslett interviewed C.T. He told Coslett that his mother burned his hands on the stove because he touched an iPad. He also said that she had hit him on the bottom with a shoe and that it left a mark "[b]ecause when she hits me she makes . . . marks." She also hit him once with a big spoon. Coslett asked C.T. what happens when he gets in trouble at his

- 4 -

grandparents' house in Mexico. He said his grandmother hit him with a back scratcher and left marks.

On October 5, 2012, Dr. Feldman examined C.T. Dr. Feldman testified that C.T. said his mother got mad and burned his hands on the stove. Dr. Feldman asked if C.T.'s mother caused any other injury. C.T. said no. Dr. Feldman testified that the band-shaped burns were caused by a hot object matching the shape of the bands, such as a stove element. In Dr. Feldman's opinion, C.T. had three separate injuries, one on his left palm and two on his right. He believed they were caused by two separate applications of the hands to the hot object. He testified that while a child might accidentally burn himself once, he would not make the same mistake twice.

When asked for his "medical opinion about the causation of the injuries," Dr. Feldman testified that an accidental cause was "terribly unlikely." VRP at 687. It was "far more likely that [C.T.'s] history and the history that he had given other people that his mother had burned him was correct." VRP at 687.

Following an offer of proof, the court revisited the motion to exclude Dr. Feldman's testimony concerning C.T.'s whip mark injury. Defense counsel argued that the evidence should be excluded because nothing linked Torrescano-Hernandez to the injury. The court disagreed, stating:

> The evidence from the witness is . . . that this is an inflicted injury. No one knows how the injury got on the child. . . .
> But that does not appear to be what is important, at least as it relates to this case.
> No one is suggesting that the defendant did, no one is suggesting that the jury should presume that the defendant did.
> What appears to be important to this case – and I didn't appreciate this until I heard what the doctor testified to in the

- 5 -

cross-examination of the doctor – what is important is the presence of the injury, which in his opinion is inflicted, and its impact on the child in willingness to disclose.

Given the way that the evidence has come out in this case, that's quite a relevant issue. How the child disclosed and the child's willingness to disclose is a significant issue in this case.

And so the doctor's testimony with regard to the injury, whoever inflicted, and the impact, in his training and experience and his subspecialty of pediatric child abuse, the impact that may have on the child's willingness to come forward and say what happened or not is significant. It is . . . a substantial issue before the jury.

VRP at 639-40.

Dr. Feldman proceeded to testify that the mark was typical of a high velocity beating with a flexible object, such as an electrical cord. The resulting pigment change can last months or years. He therefore had no way of knowing when it occurred. When asked why the injury was "significant if you don't know who did it?" Dr. Feldman said "a child who has had repetitive abuse may feel more afraid of future punishment if they disclose. They also may be more likely to disclose in little bits and pieces rather than the full picture." VRP at 669.

C.T. testified that his mother burned his hands but said "I don't know" or "I don't remember" to most questions. VRP at 451. He testified that he does not know how to turn the stove on, that he likes to eat marshmallows cooked on a stick, and that he cried when his hands were burned. He said he had seen a friend cook marshmallows over a fire, but said "I don't know" when asked if he had ever seen anyone else cook marshmallows.

In April 2012, forensic pathologist Dr. Carl Wigren took photographs of C.T.'s hands with a measuring device and then superimposed the photos over earlier photos of C.T.'s hands. He testified that the burns were consistent with a single contact of each hand to a burner. He explained that an irregularly shaped burn at the

base of C.T.'s thumb and index finger could have resulted from a fold of skin getting caught between the heating elements during a single contact. Dr. Wigren could not say whether the burns were intentionally inflicted or accidental. But he believed the injury was more consistent with an accidental burn, stating: "If the child's hands had been intentionally and firmly pressed against the heating element, one would expect the burns to be continuous and not separated by areas of sparing." VRP at 1418. He testified that if a child of C.T.'s height were standing on the open oven door and lost his balance, he could suffer burns similar to C.T.'s.

On cross-examination, Dr. Wigren conceded that if an adult tried to press a child's hands onto a stove, the child would instinctively try to minimize contact with the stove by struggling or cupping his hands. This could result in a less continuous burn pattern. Dr. Wigren also conceded the burns were probably the result of a "rapid contact" amounting to less than a second. VRP at 1447.

Torrescano-Hernandez testified and denied burning C.T.'s hands. She first noticed C.T.'s injuries on September 10, 2012, while giving him a bath. When she asked what happened to his hands, C.T. cried and would not answer. Eventually, he told her he hurt himself on the monkey bars. Torrescano-Hernandez told C.T. that if anyone saw his hands, they would think she caused the injury so he needed to tell her what really happened. C.T. then said he had tried to cook marshmallows like he had seen her do in the past. Torrescano-Hernandez testified that she sometimes toasted marshmallows over the stove as a treat. She also testified that she did not take C.T. to the doctor because she was afraid people would not believe her or C.T. Regarding the whip mark, Torrescano-Hernandez testified she first noticed it when C.T. was in Mexico. She did not know what caused the mark.

On cross-examination, Torrescano-Hernandez said C.T. never exhibited any pain or trouble eating during the days before she discovered his injury. She testified that she was probably napping in the house when the injury occurred, but she did not hear him cry or scream. When asked how she punished C.T. for the iPad incident, she said she made him read a book that he likes. The prosecutor then asked "[w]hy is it a reprimand for [C.T.] to read a book that he likes?" VRP at1268. Torrescano-Hernandez replied, "In fact, he likes reading any book. He likes reading." Id.

In closing argument, the prosecutor explained the specific purpose of the whip mark evidence:

> And make no mistake. The State is not saying that Karina inflicted that whip mark. I don't have the evidence to show you one way or the other who inflicted that whip mark on [C.T.]. Could have been his grandparents in Mexico or someone else.
> But the relevance, the importance of the mark, is that it's on [C.T.]. He experienced it. He's experienced that pattern of abuse that Dr. Feldman told you is important in understanding the context of a child's disclosure.

VRP 1531.

The jury acquitted Torrescano-Hernandez of second degree assault and the deliberate cruelty allegation, but convicted her of the lesser offense of third degree assault by criminal negligence. She appeals.

## DECISION

Torrescano-Hernandez first contends the court abused its discretion[1] in admitting evidence of C.T.'s prior whip mark injury. She contends the evidence

---

[1] We review evidentiary rulings, including rulings under ER 404(b), for abuse of discretion. State v. Ruiz, 176 Wn. App. 623, 634, 309 P.3d 700 (2013) cert. denied, 135 S.Ct. 69, 190 L.Ed.2d 63 (2014); State v. Foxhoven, 161 Wn.2d 168, 174, 163 P.3d 786 (2007);(ER 404(b)).

was inadmissible under ER 404(b) because nothing connected the injury to her. ER 404(b) is inapplicable.

ER 404(b) governs the admission of a person's prior wrongs or acts to prove something about *that person*, such as his or her character, motive, or intent, or to rebut his or her claim of accident.[2] Thus, had the State offered the whip mark evidence to rebut Torrescano-Hernandez's claim of accident, ER 404(b) would require proof that she committed the prior wrong or act. State v. Norlin, 134 Wn.2d 570, 951 P.2d 1131 (1998).[3] But the evidence was not offered to prove anything about Torrescano-Hernandez. Rather, it was offered and admitted to explain "[h]ow the child disclosed and the child's willingness to disclose [.]" VRP at 639-40. The court noted that the way C.T. reported his burns was "a significant issue in this case." The whip mark evidence was relevant to, and admissible on, that issue. Cf. State v. Wilson, 60 Wn.App. 887, 891, 808 P.2d 754 (1991) (evidence of prior assaults was admissible "to explain the delay

---

[2] ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[3] Norlin addressed whether evidence of a child victim's prior injuries was admissible to show that the injury underlying the current charge was not the result of an accident. The Norlin court held that such evidence is admissible under ER 404(b) only if the defense establishes a connection between the acts and the defendant. In so holding, the court stated:

> Because logic suggests that the only 'crimes, wrongs, or acts' that would have any weight **as to a defendant's character** are those that were committed by the defendant, it follows that the portion of ER 404(b) allowing the admission of such evidence is similarly limited to 'crimes, wrongs, or acts' that are tied to the defendant.

(Emphasis added) Norlin, 134 Wn.2d at 577. As we explain, the evidence in this case was offered for a purpose outside the ambit of ER 404(b). Norlin is therefore inapposite.

in reporting . . . sexual abuse"); State v. Nelson, 131 Wn. App 108, 116, 125 P.3d 1008 (2008) (defendant's previous violent and abusive demeanor after drinking was admissible to explain victim's fear, minimization, and inconsistent reports). In light of Dr. Feldman's testimony, the court was within its discretion in admitting the whip mark evidence. ER 401; ER 403.

Torrescano-Hernandez argues, however, that the evidence was not relevant under Dr. Feldman's testimony unless the prior injury was inflicted by her. Noting that Dr. Feldman stated that a "pattern" of abuse may affect a child's willingness to disclose, she argues that his testimony supports admission of C.T.'s prior injury only if the "pattern" of abuse was caused by a single person. Torrescano-Hernandez misinterprets Dr. Feldman's testimony.

Dr. Feldman testified that "[a] child who has had *repetitive abuse* may feel more afraid of future punishment if they disclose" and "may be more likely to disclose in little bits and pieces [.]"(Emphasis added.) VRP at 669. While he also spoke of a "pattern" of abuse, Dr. Feldman used the words repetitive and pattern interchangeably. He implicitly, if not expressly, indicated that his opinion encompassed injuries inflicted by different people. According to Dr. Feldman, a child who suffers repeated abuse at the hands of one or more abusers is more likely to have difficulty disclosing the abuse. Given Dr. Feldman's testimony, the relevance and admissibility of the whip mark injury did not depend on whether Torrescano-Hernandez inflicted it.

In any event, any error in admitting the whip mark evidence was harmless. We review evidentiary errors, including errors under ER 404(b), under the nonconstitutional harmless error standard. State v. Ray, 116 Wn.2d 531, 546,

806 P.2d 1220 (1991). Reversal is required only if there is a reasonable probability that the outcome of the trial was materially affected by the error. Id. There is no reasonable probability that the whip mark evidence affected the verdict.

C.T.'s friend recounted an incident in which Torrescano-Hernandez hit C.T.'s back with a spoon and broke the spoon.[4] M.D. testified that C.T. said his mom "used to burn him with hot tortillas." VRP at 496. Physician assistant Janell Ibsen testified that when she asked C.T. about various markings on his skin, he said "Oh, I've been hit by a few things." VRP at 755. C.T. told Ibsen his mother had hit him with a shoe and a spoon. C.T. also told a child interview specialist that his grandmother hit him with a back scratcher and left marks. The jury could infer that at least some of these incidents were sufficiently abusive to have the same effect as the whip mark injury on C.T.'s willingness to disclose. Thus, for purposes of Dr. Feldman's opinion of repetitive abuse, the whip mark injury was cumulative of other evidence.

Furthermore, prior incidents of abuse were not the only evidence supporting the State's theory that C.T.'s varying statements and delayed disclosure were due to a reluctance to disclose. C.T. initially hid his hand injuries from others and asked M.D. not to tell anyone that his mother burned his hands. And social worker Berger testified that it is relatively common for children to be reluctant to disclose what their parents did or did not do to them. This evidence supported the State's theory as well.

---

[4] The friend conceded on cross-examination that she said in a defense interview that the spoon did not break.

Torrescano-Hernandez next contends Dr. Feldman's testimony included an impermissible opinion on guilt. She acknowledges that this argument is raised for the first time on appeal. She contends, however, that it is a manifest constitutional error and therefore properly before the court under RAP 2.5(a). We disagree.

Generally, an appellate court will not consider issues raised for the first time on appeal.[5] An exception exists for manifest errors affecting constitutional rights.[6] This exception "is narrow," however, and where the alleged error is an opinion on guilt, it is not "'manifest' constitutional error" absent "a nearly explicit statement by the witness that the witness believed the accusing victim." State v. Kirkman, 159 Wn.2d 918, 936, 155 P.3d 125 (2007).

Here, Torrescano-Hernandez contends Dr. Feldman expressed an opinion on guilt when he testified as follows:

> So my conclusion was that it would be terribly unlikely for a normal six-and-a-half-year-old to have sustained those three separate burn injuries from an accidental event on his part.
> And far more likely that his history and the history that he had given to other people that his mother had burned him was correct. VRP at 687.

This testimony did not amount to an opinion on guilt. An expert's opinion based solely upon inferences from the physical evidence and the expert's experience does not constitute an impermissible opinion on guilt. State v. Baird, 83 Wn. App. 477, 486, 922 P.2d 157 (1996) (testimony that the victim's injuries appeared to be deliberately inflicted was permissible because it "did not rely upon a

---

[5] State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).

[6] RAP 2.5(a)(3).

- 12 -

judgment about the defendant's credibility, but rested upon . . . experience and training and treatment of" the victim's injuries). Dr. Feldman simply drew inferences regarding the likely cause of C.T.'s injuries from his experience and his examination of the injuries. This was permissible.

In addition, an alleged error is "manifest" only if there is a showing of actual prejudice – i.e., a "'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" Kirkman, 159 Wn.2d at 935 (internal quotation marks omitted) (quoting State v. WWJ Corp., 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)). An important consideration in determining whether opinion testimony prejudices the defendant is whether the jury was properly instructed. State v. Montgomery, 163 Wn.2d 577, 595, 183 P.3d 267 (2008). In Kirkman and Montgomery, the courts held the defendants were not prejudiced by allegedly improper witness testimony because "the jury was properly instructed that jurors 'are the sole judges of the credibility of witnesses' and 'are not bound' by expert witness opinions." Montgomery, 163 Wn.2d at 595 (quoting Kirkman, 159 Wn.2d at 937). The same instructions were given in this case. There was no actual prejudice.

Given our conclusions that Dr. Feldman's testimony was not an opinion on guilt and did not result in actual prejudice, Torrescano-Hernandez's claim that her trial counsel was ineffective for failing to object to the testimony fails. See State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (to prove ineffective assistance, defendant must show both deficient performance and resulting prejudice).

Affirmed.

Spellman, C.J.

WE CONCUR:

Trickey, J

Dau, J.