IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35349-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL HERBERT DUNBAR, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Daniel Dunbar appeals his convictions for possession of a stolen

motor vehicle and witness tampering. He contends his inability to obtain answers in

cross-examining a critical witness deprived him of his Sixth Amendment[1] right of

confrontation, but we conclude it was his own argument that invited the court's mistaken

belief that it could not compel answers. We find no abuse of discretion in two

evidentiary rulings that are challenged, and conclude that given the unit of prosecution in

witness tampering cases, no unanimity instruction was required. The convictions are

affirmed.

---

[1] U.S. CONST. amend VI.

FACTS AND PROCEDURAL BACKGROUND

Victoria Enright owned a white 2001 Pontiac Grand Am that she reported stolen on December 13, 2016. She told a responding officer that it had to have been stolen between 3:00 a.m., when she went to bed, and 1:00 p.m., when she noticed it missing. Although she had no proof that Daniel Dunbar stole the car, she told the deputy she suspected him of taking it. She described Mr. Dunbar as a former friend, but suspected him "[b]ecause he was the only one that I felt had a problem with me at the time." Report of Proceedings (RP) at 245.

For days, Ms. Enright communicated by text and phone calls with Mr. Dunbar, accusing him of having taken her car. He denied stealing it, but told Ms. Enright he knew who had it.

A week after the car went missing, Ms. Enright, who had been provided with a rental car by her insurer, drove around areas familiar to Mr. Dunbar. She came across her Pontiac parked on the side of the road with Mr. Dunbar asleep inside. Its valid license plates had been replaced with others. She approached the car, told Mr. Dunbar to get out, and punched him in the face. She then drove her rental car to a nearby gas station and called the police to report having located her car.

Her report was referred to Spokane County Sheriff's Deputy Wade Nelson, who traveled to where Ms. Enright reported having seen the car. He saw both the car and Mr.

Dunbar, who was walking away from it. The deputy called out to Mr. Dunbar, who returned and spoke to him. Mr. Dunbar provided his name and admitted having heard "through a grapevine" that Ms. Enright suspected him of taking her car. RP at 329. He told the deputy it was actually "Cody" who took the Pontiac, not him. *Id.* Mr. Dunbar claimed he found Ms. Enright's car and decided to drive it to a friend's house but had run out of gas. He claimed he tried to contact Ms. Enright that morning to return the car to her.

Deputy Nelson arrested Mr. Dunbar for possessing a stolen vehicle. In a search incident to arrest, he found Mr. Dunbar to be carrying a shaved key. Mr. Dunbar was charged with possession of a stolen motor vehicle and making or possessing a motor vehicle theft tool.

The charges were later amended to include a charge of witness tampering, based on Mr. Dunbar's contacts with Ms. Enright between December 20, 2016 and January 29, 2017. The first was a phone call from the county jail on the night of Mr. Dunbar's arrest. During the call, he asked Ms. Enright if she was pressing charges, told her she shouldn't, and claimed he did not steal her car but had only been trying to get it back for her at the request of her aunt. In the second contact, a rambling voicemail message left for Ms. Enright on January 4, 2017, he accused her of giving him permission to recover her car and implied he could make trouble for her with her insurer. He focused on whether she would appear at trial:

> Alls you have to do is not show up for trial. I am not telling you what to do. I am not asking you what to do. I am asking you are you coming or not? I need to know. Trial is on the 13th of next month. And it's your choice. . . . You know that I dealt with your insurance company before, so we can go two ways with this. You could lose your truck or I can just get out and call to thank you for being . . . (inaudible) even if you testify, and be friends, maybe, I hope. Maybe not but here's the deal. Are you coming to testify or not? I need to know now. Bye.

Ex. P-14. In the third call, made on January 29, Mr. Dunbar was apologetic and again asked Ms. Enright if she was coming to trial. When she answered that she didn't know and asked him why, Mr. Dunbar, who faced prosecution on other pending charges, answered:

> Because if you don't come then that one will each get dismissed. They offered me 114 months. They want to run, they want to run two of them back to back on me; that is what they want to do. I told them no, let's go to trial, because I am off the scale on points. You know what I mean?

Ex. P-13 (some capitalization omitted).

The State's efforts to subpoena Ms. Enright to appear at trial were unsuccessful, and as the trial date approached, the State planned to rely on the doctrine of forfeiture by wrongdoing to offer her prior statements in lieu of live testimony. Approximately a week before trial, however, the State learned of Ms. Enright's whereabouts, obtained a material witness warrant, and was successful in locating and detaining her in the Spokane County Jail. Upon return of the warrant on the Friday before trial, Scott Mason was appointed to serve as her counsel and Ms. Enright was released based on her assurance to the court that she would appear for trial the next week.

4

The State called Ms. Enright as its first witness on Wednesday, March 8. During her direct testimony, Ms. Enright testified to why she suspected Mr. Dunbar of stealing her car, their communications after it went missing, and her finding him in her car on December 20 and reporting her discovery to police. She identified photographs of the car taken on December 20, and testified that she never gave Mr. Dunbar permission to take her car on December 13 and never asked for his help in recovering it. She identified Mr. Dunbar's voice on the telephone recordings offered by the State and testified that she was known by the name "Tory," the name Mr. Dunbar used in the calls.

Defense counsel asked for a break before cross-examining Ms. Enright. Outside the presence of the jury, she made an offer of proof that Ms. Enright had signed a diversion agreement under penalty of perjury in which she represented, falsely, that she had no felony charges pending in Washington or elsewhere. The defense wished to use the information to challenge Ms. Enright's credibility under ER 608(b).

The State objected to what it characterized as an "ambush" but also suggested that "perhaps Mr. Mason should be here, Your Honor," observing that "we have law enforcement sitting here, and if [Ms. Enright] commits perjury or submits she commits perjury, she is subject to being arrested." RP at 268-69. The trial court recessed for the morning and directed the lawyers to contact either Mr. Mason or public defender Jeremy

5

Schmidt, whom defense counsel believed might be representing Ms. Enright at that point.

The court wanted Mr. Mason or Mr. Schmidt to confer with Ms. Enright and provide

input to the court.

During the recess, Mr. Schmidt arrived and conferred with Ms. Enright. At the

outset of the afternoon session he informed the trial court of the advice he had given her:

> MR. SCHMIDT: . . . What I have advised my client AND what we respectfully ask is that she would invoke her right to remain silent at this time so as not to make any potentially incriminating statements. That would be our position, that she would exercise her right at this time. And I have advised both parties of that.
>
> THE COURT: Very well.
>
> MR. SCHMIDT: If you have any questions at this point, Your Honor, my preference would be that she not be subjected to any more questioning as to not potentially get into this area that is being discussed. So my preference would be to not have her testify further. I have explained to her her obligations under the subpoena and her obligations under the contempt and other statutes, obviously comply with the Court's instruction, but my preference now would be to have questioning cease as it may lead into this incriminating area.

RP at 275-76.

When invited to address the issue, the State suggested that the court avoid the

issue by excluding any questioning about the diversion agreement, proposing several

bases for exclusion. The court then invited defense counsel to weigh in, and the defense

6

raised the confrontation clause and asked the court to strike Ms. Enright's direct testimony on the basis of the Sixth Amendment and *Crawford v. Washington.*[2]  After hearing further from the lawyers, the trial court took a recess and on returning to the courtroom ruled on the confrontation objection.  It announced its decision that Ms. Enright "continue on."  RP at 299.  It added,

> And if she decides she needs to assert the Fifth Amendment,[3] she can. *I think it would be inappropriate to strike all of her testimony given that the way the defense laid on this, one, knowing that the defense was going to assert that document and assert this tack of alleged perjury.*

RP at 299 (emphasis added).

The trial court "invite[d] from the State any other suggestions the State might have."  *Id*.  The State continued to argue that if the court ruled that the diversion agreement was excluded, it would solve the problem.  When the court granted defense counsel's request to address the court, she introduced the notion that if Mr. Schmidt advised Ms. Enright to invoke the Fifth Amendment in response to all of her questions, Mr. Dunbar would be denied his ability to confront her:

> [DEFENSE COUNSEL]:  It's my understanding that Mr. Schmidt already indicated that he is advising his counsel to no longer provide any sort of testimony.  I think that changes the picture, then, if the court just limits me in my ability to cross her as to the Diversion Agreement.  *If his*

---

[2] *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[3] U.S. CONST. amend. V.

> *advi*[c]*e is to no longer testify and to plead the Fifth on any further*
> *questioning, that puts us in a different place than pretending like I have*
> *the opportunity to cross-examine her if she gets up on the stand and I*
> *get to ask her things that aren't of consequence.*
>
> THE COURT: *I don't have any control over that.*
>
> [DEFENSE COUNSEL]: I'm just asking if we clarify, if his
> intention is she is not going to testify at all, I think then we need to address
> that issue versus she is going to get up on the stand and she will talk a little
> bit. Those are two different scenarios, and I am hoping we can inquire of
> Mr. Schmidt.

RP at 302-03 (emphasis added).

Asked to clarify his position, Mr. Schmidt told the court that he would advise his

client to generally invoke her right against incrimination, although repeating "we'll do

whatever the court orders." RP at 304. The court responded:

> THE COURT: *I can't order her forgo her Fifth Amendment right.*
> *She is going to invoke it where she invokes it.*
>
> MR. SCHMIDT: The only issue within that is if the court were to
> determine she's not protected by that, about questions that have nothing to
> do with incrimination. My concern is without a limiting on what's going
> to be asked, I've got to advise her generally that we would not testify at this
> time further or that she would specifically assert her right.
>
> THE COURT: Do you have authority that you just blanket assert
> the Fifth Amendment and don't testify at all? I mean, the day of the week
> is Wednesday, the 8th. Fifth Amendment.
>
> MR. SCHMIDT: My understanding is that once a defendant has
> invoked the Fifth Amendment, they are not allowed to do it. . . . That's
> been my understanding of it, Your Honor. I have not briefed it for today's
> purposes. That is just, I understood it was not a selective right. It was
> more of a ["]you testify or you do not.["] But that is just based on my
> anecdotal understanding of the Fifth Amendment.
>
> THE COURT: All right.

8

RP at 304-05 (emphasis added).

As the colloquy continued, defense counsel stated:

> [DEFENSE COUNSEL]: What I'm hearing Mr. Schmidt saying is that his client is seeking to invoke her Fifth Amendment right, a blanket assertion. That's my understanding as defense attorney, as well. So it's not that she can get up and I ask can [sic] her [a] specific question and she can respond to it, but when she feels uncomfortable with, she can seek her Fifth Amendment right.

RP at 306.

The State never disagreed. Asked if the State had "[a]nything further," the prosecutor answered, "No, Your Honor." RP at 307. At that point the court stated:

> THE COURT: I'm going forward with my ruling, then. Ms. Enright can take the stand. We'll bring the jury back. You ask your questions. If she wants to invoke her Fifth Amendment, she can.

*Id.*

Ms. Enright answered the first three questions posed in cross-examination: she acknowledged her name, said she remembered promising to tell the truth, and said she owned the Grand Am. RP at 309-10. Beginning with defense counsel's next question—"Where did you buy it?"—she answered, "I invoke my Fifth Amendment right." RP at 310. She provided the same answer to defense counsel's next 43 questions, which we include in an appendix. Thirty-two of the questions appear related to the possession of a stolen vehicle charge. Eleven appear related to the witness tampering charge. Neither party asked the trial court to order Ms. Enright to respond to any of the questions.

9

The State's remaining witnesses included the city of Spokane police officer who responded to Ms. Enright's December 13 report of vehicle theft. On cross-examination, he agreed that the neighborhood from which the Pontiac was stolen was a high crime area and stated it is a matter of common knowledge that Spokane has a high rate of stolen motor vehicles.

The State also called Deputy Sheriff Nelson, who testified to his actions and contacts in recovering the car and questioning Mr. Dunbar.

The defense called only one witness: Leanne Shelly, who owned the house in which Ms. Enright was staying on December 13, where the Pontiac was parked when stolen. Before she testified, the trial court granted a request by the State for an in limine ruling foreclosing two areas of questioning: questioning about whether Ms. Shelly asked Mr. Dunbar to help Ms. Enright recover her car, and whether she saw Ms. Enright change the license plates on the Pontiac after it had been recovered.

Ms. Shelly testified that not only was Ms. Enright staying at her home on December 13, but Mr. Dunbar was staying there as well. She described both Ms. Enright and Mr. Dunbar as friends, stating she had known Ms. Enright for about a year and Mr. Dunbar for two or three years. She testified she had seen Mr. Dunbar drive Ms. Enright's car in the past, with or without Ms. Enright accompanying him. She testified that Mr. Dunbar did not drive Ms. Enright's car a lot, but she believed he had driven it a few times within the month before it went missing on December 13—although not the day before.

10

She described Ms. Enright's Pontiac as "[n]ice on the outside, not so nice on the inside." RP at 430. She testified that even before December 13, it had a damaged ignition that hung from the dashboard and a driver's side window that did not fully close and, if pushed, would fall into the door. She characterized the neighborhood in which her home was located as "[n]ot good." RP at 428.

The jury found Mr. Dunbar guilty of possession of a stolen motor vehicle and guilty of witness tampering, but not guilty of making or possessing a motor vehicle theft tool. Mr. Dunbar's motion for a new trial on grounds related to Ms. Enright's testimony was denied. He appeals.

## ANALYSIS

Mr. Dunbar assigns error to (1) the trial court's refusal to strike the testimony provided in Ms. Enright's direct examination, (2) its order limiting the questioning of Ms. Shelly, which he argues denied his right to present a defense, and (3) its failure to give a *Petrich*[4] instruction on the witness tampering charge. We address the assignments of error in the order stated.[5]

---

[4] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).
[5] A fourth assignment of error challenged the trial court's sentencing decision to run one count of a separate sentence consecutively to the sentence imposed in this case. Sentencing in both cases happened on the same day. Mr. Dunbar raises the same issue in the appeal of the other case, and now concedes that the asserted error should be addressed in that appeal, not this one.

11

No. 35349-4-III
*State v. Dunbar*

I.    THE TRIAL COURT'S MISTAKEN BELIEF THAT IT COULD NOT ORDER MS. ENRIGHT
      TO TESTIFY WAS INVITED ERROR

Both parties' arguments on appeal proceed on the basis that the trial court

believed, and had made clear, that it would not entertain a motion to order Ms. Enright to

answer questions that did not implicate her Fifth Amendment privilege.[6]  This was error.

The State argues it was invited error.

Washington recognizes an obligation of a witness to testify.  *State v. Ruiz*, 176

Wn. App. 623, 635, 309 P.3d 700 (2013) (citing *State v. Parker*, 79 Wn.2d 326, 331, 485

P.2d 60 (1971)); *State v. Green*, 71 Wn.2d 372, 378, 428 P.2d 540 (1967).  Statutes

confirm the obligation.  *Ruiz*, 176 Wn. App. at 635; RCW 5.56.010; RCW

7.21.010(1)(c); RCW 10.52.040.  Courts typically use the contempt power to address a

refusal to testify.  *Ruiz*, 176 Wn. App. at 635; RCW 5.56.061; ch. 7.21 RCW.

The primary exception to the obligation to testify is the Fifth Amendment's

privilege against compulsory self-incrimination.  *Ruiz*, 176 Wn. App. at 635.  It can be

asserted on a blanket basis by a criminal defendant but in most other cases, must be

asserted on a question by question basis.  *Id.* at 635-36.  "[A] witness must explicitly

claim his Fifth Amendment guarantee or it will be deemed waived," but "[t]he court, not

---

[6] The validity of this impression is affirmed by a statement by the trial court to defense counsel later in the trial.  It said, "The fact that you weren't able to cross-examine Ms. Enright further is not anything that any of us can do anything about.  Ms. Enright elected to assert the Fifth Amendment."  RP at 415.

12

the witness, is the final judge of the validity of the claim." *Parker*, 79 Wn.2d at 332

(citing *United States v. Murdock*, 284 U.S. 141, 52 S. Ct. 63, 76 L. Ed. 210 (1931) and

*Hoffman v. United States*, 341 U.S. 479, 71 S. Ct. 814, 95 L. Ed. 1118 (1951)).

Ms. Enright's unwarranted invocation of her Fifth Amendment right should not

have created a confrontation problem. She was present. The record would suggest that

she could have been ordered by the court to answer virtually all of the questions posed by

defense counsel. When a witness appears and is available for cross-examination at trial,

the confrontation clause is not implicated. *See Crawford*, 541 U.S. at 59, n.9 (citing

*California v. Green*, 399 U.S. 149, 162, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970). "The

Clause does not bar admission of a statement so long as the declarant is present at trial to

defend or explain it." *Id.* "'[T]he Confrontation Clause guarantees only "an *opportunity*

for effective cross-examination, not cross-examination that is effective in whatever way,

and to whatever extent, the defense might wish."'" *State v. Price*, 158 Wn.2d 630, 648,

146 P.3d 1183 (2006) (alteration in original) (quoting *United States v. Owens*, 484 U.S.

554, 559, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988)).

Ms. Enright's unwarranted invocation of her Fifth Amendment right created a

confrontation problem only because the trial court believed it could not order Ms. Enright

to answer defense counsel's questions. We agree with the State that this error was invited

by defense counsel. The invitation to error was made even before defense counsel

13

seconded Mr. Schmidt's understanding that Ms. Enright was entitled to make a blanket assertion of her Fifth Amendment right. It was first made when defense counsel argued to the court that if Ms. Enright asserted privilege in response to every question, Mr. Dunbar would be deprived of the opportunity to cross-examine her.

The goal of the invited error doctrine is to prevent a party from setting up an error at trial and then complaining of it on appeal. *City of Seattle v. Patu*, 147 Wn.2d 717, 720, 58 P.3d 273 (2002). It does not require that a party *intentionally* invite error; it applies "even in cases where the error resulted from neither negligence nor bad faith." *Id.* The trial court struggled with the notion that Ms. Enright could unilaterally decide which questions to answer, but Mr. Dunbar's argument that protection of his confrontation right required striking her direct testimony *depended* on that notion. "[A] party may not materially contribute to an erroneous application of law at trial and then complain of it on appeal." *Ames v. Ames*, 184 Wn. App. 826, 849, 340 P.3d 232 (2014) (citing *In re Dependency of K.R.*, 128 Wn.2d 129, 147, 904 P.2d 1132 (1995)).

II.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN LIMITING MS. SHELLY'S TESTIMONY

Mr. Dunbar next argues he was deprived of his right to present a defense when the trial court limited his questioning of Ms. Shelly.

Under both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution, a defendant has the right to obtain witnesses

14

and present a defense. *State v. Thomas*, 150 Wn.2d 821, 857, 83 P.3d 970 (2004), *aff'd*, 166 Wn.2d 380, 208 P.3d 1107 (2009). The right does not mean that a defendant may introduce whatever evidence he wishes, however. *State v. Sanchez*, 171 Wn. App. 518, 554, 288 P.3d 351 (2012). When the application of evidence rules is at issue, the right to present a defense means only that "state-law evidentiary restrictions cannot be 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010) (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)). We review a trial court's evidentiary rulings for an abuse of discretion, but review a denial of Sixth Amendment rights de novo. *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

The first evidence that the trial court foreclosed was testimony by Ms. Shelly that she had asked Mr. Dunbar to help recover Ms. Enright's car. The trial court provided the following explanation of its ruling:

> [W]hether Ms. Shelly asked Mr. Dunbar to help Ms. Enright get her car back, it isn't probative of whether or not Ms. Enright gave Mr. Dunbar permission to drive her car. And to the degree she would have to say she had authority on behalf of Ms. Enright, then she would be relying on hearsay and it all becomes too confusing and potentially unfairly prejudicial.

RP at 415. Mr. Dunbar argues that the evidence was relevant to Mr. Dunbar's intent, and especially important given his inability to cross-examine Ms. Enright.

15

Mr. Dunbar's inability to cross-examine Ms. Enright does not weigh in his favor in light of our finding of invited error, and his argument that Ms. Shelly's testimony could substitute for Ms. Enright's underscores the court's concern about relevance and confusion. The jury was instructed that the intent required for possession of a stolen vehicle was knowingly possessing such a vehicle, knowing it was stolen. Whether Mr. Dunbar believed he was performing a good deed or responding to a mutual friend's request was not relevant to any fact the jury was instructed to decide. The trial court did not abuse its discretion in making the evidentiary ruling. Since the evidence was not relevant, its exclusion does not violate Mr. Dunbar's right to present a defense. Defendants have a constitutional right to present only relevant evidence. *Jones*, 168 Wn.2d at 720.

The second piece of excluded testimony was Ms. Shelly's testimony that she saw Ms. Enright switching the license plates on her car after her car was recovered by law enforcement. The State had emphasized evidence that when Mr. Dunbar was found with the car, it bore different license plates than the validly-issued plates that it bore when stolen. Mr. Dunbar conceded that this supported an inference that he had changed the plates. He argued that evidence that Ms. Enright changed the plates at a later time supported an inference that she, rather than he, might have changed the plates between December 13 and 20.

16

The court was told that Ms. Shelly saw Ms. Enright change the plates, but it was not known whether, if that was true, Ms. Enright was performing a criminal act or simply reinstalling valid plates returned to her by law enforcement. Defense counsel represented that Ms. Shelly "thinks . . . they weren't the plates that were supposed to be on the vehicle" but when asked the basis for that belief, defense counsel's only explanation was that Ms. Shelly was sitting in the car when Ms. Enright replaced the plates. RP at 410. The trial court excluded the evidence as more prejudicial than probative. Again, we find no abuse of discretion in the evidentiary ruling. Its exclusion on the basis of ER 403 was not arbitrary or disproportionate to that rule's purpose.

III.     NO *PETRICH* INSTRUCTION WAS REQUIRED

For the first time on appeal, Mr. Dunbar argues that because the State's witness-tampering evidence consisted of his conduct on three different occasions, the trial court should have given a unanimity instruction.

A jury must unanimously agree on the act that supports a conviction. *Petrich*, 101 Wn.2d at 569; *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). Where multiple acts could constitute the crime charged, the State must either elect which act it will rely on for conviction or the trial court must give a unanimity, or *Petrich*, instruction informing the jury that it must agree on the same criminal act. *State v. Vander Houwen*, 163 Wn.2d 25, 38, 177 P.3d 93 (2008); *Kitchen*, 110 Wn.2d at 409. A failure to give a

unanimity instruction where one is required may be raised for the first time on appeal because it is manifest constitutional error. *State v. Kiser*, 87 Wn. App. 126, 129, 940 P.2d 308 (1997), *review denied*, 134 Wn.2d 1002, 953 P.2d 95 (1998).

If separate acts amount to a continuing course of conduct, then a multiple acts case is not presented and a unanimity instruction is not required. *State v. McNearney*, 193 Wn. App. 136, 141, 373 P.3d 265 (2016). The State argues that Mr. Dunbar's three calls to Ms. Enright constituted a continuing course of conduct.

The legislature can itself decide that it is a *course of conduct* that is criminal, by creating a unit of prosecution for continuing conduct. In *State v. Hall*, 168 Wn.2d 726, 734, 230 P.3d 1048 (2010), the Washington Supreme Court determined that the unit of prosecution for the crime of witness tampering is "the ongoing attempt to persuade a witness not to testify in a proceeding." As a result, it found a double jeopardy violation where Hall was convicted of three counts of witness tampering that involved a single witness in a single trial. While the *Hall* court allowed for the possibility of a different result if a defendant's efforts "are interrupted by a substantial period of time, employ new and different methods of communications, involve intermediaries," or otherwise demonstrate a different course of conduct, *id.* at 737-38, those facts were not before the court in *Hall*. They are not present here. It was Mr. Dunbar's course of conduct between December 20 and January 29 that amounted to a single count of witness tampering. The jury was properly instructed.

18

No. 35349-4-III
*State v. Dunbar*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Korsmo, J.

19

APPENDIX

Ms. Enright responded to the following questions posed in cross-examination by asserting her Fifth Amendment privilege:

Where did you buy it?

On December 13, where were you staying?

Did you have a permanent address at DeSmet?

And you noticed your car was missing on the 13th between 6:00 a.m. and 1:45?

Were you the last one to drive your car and park it at the DeSmet address?

Can you tell me who did drive your car parked at the DeSmet address?

Who else was staying at the DeSmet address?

Whose house was it?

Was anyone else staying there?

What was your relationship with Mr. Dunbar?

How long had you known him?

Did you continue to stay at the DeSmet address after December 13?

You called law enforcement on December 13?

Do you remember what you told law enforcement when he arrived?

You told the 911 caller that you thought Mr. Dunbar had your vehicle?

Did you tell law enforcement that the ignition to your car did not require a key?

Did you tell law enforcement that the car could be opened through the window that was also broken?

Did you see Mr. Dunbar take your car?

Did you see Mr. Dunbar drive your vehicle that morning?

And you texted with Mr. Dunbar?

Did the law enforcement officer ask you for Mr. Dunbar's contact information when he was there?

Did you volunteer Mr. Dunbar's information?

How long did you speak with law enforcement?

What were you doing in Spokane Valley the morning of December 20th?

When you found Mr. Dunbar in your car, you punched him in the face?

You told him to get out?

You didn't take the car from him at the time you saw him?

And you left the scene to call law enforcement?

And when law enforcement called you that morning, you didn't answer?

When Mr. Dunbar called you that morning, you didn't answer?

Had you received any additional phone calls from Mr. Dunbar that morning of the 20th?

You didn't stay at the scene of the gas station for law enforcement to respond to your area, did you?

But that morning you answered his phone call from the jail?

Mr. Dunbar was upset?

And you answered another phone call from Mr. Dunbar; is that right?

And it was a choice to answer those phone calls?

And you indicate that you received a voice message?

And did you notify law enforcement that Mr. Dunbar was calling you while he was incarcerated?

Mr. Dunbar had helped you out on previous occasions; is that right?

And those phone calls that Mr. Dunbar was making, did he tell you it was your choice to appear?

Did he tell you he can't tell you what to do?

Do you know somebody by the name of Cody?

Did you tell Mr. Dunbar that he could or did you ask Mr. Dunbar to recover your vehicle?