[No. 22272-4-I. Division One. May 14, 1990.]

THE STATE OF WASHINGTON, *Respondent*, v. SHANNON HALE DENTON, *Appellant*.

252

*Andrew P. Zinner* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Peter Goldman, Deputy,* for respondent.

SCHOLFIELD, J.—Shannon Hale Denton appeals his convictions for two counts of robbery in the second degree. We affirm.

## FACTS

On September 21, 1987, Denton was charged by information with two counts of robbery in the second degree. In count 1, Denton was alleged to have robbed a teller at the Lake Hills branch of Seattle–First National Bank on

August 28, 1987, obtaining $1,108 in cash. In count 2, Denton was alleged to have robbed a teller at the Bellevue branch of Peoples National Bank on September 4, 1987, obtaining $1,946.97 in cash.

Although Denton admitted that he committed the bank robberies, he presented a defense of duress. Denton testified that on both occasions he was accosted by a man previously unknown to him, who ordered Denton to rob the banks to repay money that Denton owed to an individual named John Walker.

Denton claimed that in early August, while he was living in Walker's home, Walker dragged him out of bed by the hair one morning and pointed a shotgun at him. According to Denton, Walker tortured him for the next several hours, including handcuffing him to a pipe, shocking him with an electrical cord, cutting his hair, beating him with the gun, putting the gun in his mouth, and ordering Denton to confess on tape to stealing cocaine from Walker. Walker also threatened to have Denton killed.

After Denton was arrested for robbery on September 17, 1987, he called Detective Edward Striedinger, the detective who had investigated Walker's assault upon Denton. Denton asked Striedinger to intervene to keep him separated from Walker in the King County Jail.

Striedinger testified that he had received a previous message that Denton was in jail, so when he heard background noise, he asked Denton if he was calling from jail, to which Denton responded affirmatively. Denton told Striedinger that he had been arrested for robbery. Striedinger testified that he "kiddingly" asked Denton if he had robbed a 7–Eleven, and Denton responded that he had been arrested for bank robbery. Apparently not realizing that Denton was serious, Striedinger asked, "[D]id you do it?", and Denton responded, "I was there."

Striedinger then asked him if he had had a gun, and Denton said yes, and described the gun to Striedinger. Denton then told Striedinger that someone had ordered him to rob the bank. Striedinger told Denton that his story

was not believable, and the conversation turned back to the primary purpose of Denton's call, being protected from Walker in jail.

John Walker testified, and admitted the assault upon Denton. Walker admitted to making threatening remarks about having friends who would kill Denton. However, Walker denied handcuffing Denton to the pipe in the basement, and he denied using a severed electrical cord to shock Denton. Walker testified that he did not know about the bank robberies before they occurred and that he did not ask anyone to commit the robberies, nor did he compel anyone to do so.

Defense counsel informed the court of her intention to call Carl Livingston, who had been a cellmate of Walker's at prison in Shelton. In her offer of proof, she said that Livingston had told her that Walker had described the assault on Denton, how he (Walker) had done certain things to Denton that he would deny when he testified, and also that he (Walker) had sent two men out after Denton. Defense counsel also wished to recall Walker to ask if he had made those statements to Livingston. The trial court reserved ruling on the question of recalling Walker.

Defense counsel subsequently renewed her request to question Walker about the alleged statements. She also asked to be put under oath to testify as to what Livingston had told her. Counsel told the court that she wished to lay a foundation for Livingston's testimony; she stated that she anticipated that Walker would deny making the statements to Livingston and that Livingston's testimony would become relevant to impeach that denial. The trial court ruled that the defense offer of proof was sufficient and that further testimony from counsel was unnecessary.

Outside of the presence of the jury, Livingston testified only that he had been Walker's cellmate and that he had spoken to defense counsel. He refused to answer any questions regarding the substance of his conversation with

Walker, because he did not want to be labeled a "snitch". The trial court cited Livingston for contempt, and sentenced him to 11 months' incarceration for refusing to testify.

Defense counsel again asked to be allowed to examine Walker regarding his statements to Livingston. The court ruled that in the absence of Livingston's testimony, such questions were irrelevant and would invite the jury to speculate, since it was clear that Walker would deny having made the statements.

Denton was found guilty as charged on both counts. He was sentenced within the standard range. This appeal timely followed.

## HEARSAY STATEMENTS

Denton argues that Walker's statements to Livingston were admissible as statements against penal interest and that Livingston's statements to defense counsel were admissible due to their reliability. Denton further contends that defense counsel should have been permitted to ask Walker about these alleged statements to Livingston for impeachment purposes. The State argues that defense counsel never requested to testify *before the jury* as to Livingston's statements to her. The State also contends that the trial court correctly refused to allow defense counsel to attempt impeachment of Walker without Livingston's testimony.

ER 804(b) provides in pertinent part:

**Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Although firmly rooted exceptions to the hearsay rule such as statements against interest carry their own reliability, the drafters of the Rules of Evidence apparently believed that statements offered on behalf of a criminal defendant require further assurances of their trustworthiness.

An analysis of factors set forth in *State v. Parris*, 98 Wn.2d 140, 654 P.2d 77 (1982) to evaluate the trustworthiness of an out–of–court declaration yields the result that Livingston's testimony should have been admissible, and the trial court below was prepared to allow his testimony.[1] However, Denton argues that because Livingston was unwilling to testify, his attorney should have been permitted to testify as to what Livingston told her. ER 805 states as follows:

> Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.

The rule does not require that both statements satisfy the same exception. *See* 5B K. Tegland, Wash. Prac. § 408 (1989). Denton acknowledges that Livingston's statements to defense counsel did not fall within any of the enumerated exceptions to the hearsay rule, but argues that the circumstances surrounding the statements indicated their trustworthiness. Denton argues that Livingston's statements were against his interests of health and safety because he could have been labeled an informer for doing so.

■ We need not decide whether Livingston's statements to defense counsel were sufficiently trustworthy. As the State's brief notes, defense counsel never asked the court to rule on whether she could testify in front of the jury.

---

[1]Although the trial court would have permitted Livingston to testify, we believe that had he testified as described by defense counsel, such evidence would have only marginal relevance. The evidence regarding the additional particulars of the assault on Denton and the information that Walker had sent out two men after Denton would only be probative of Denton's fear of Walker in general, and would not be specifically relevant to Denton's claim that a man came to Denton each time to coerce him into robbing the banks.

Defense counsel offered only to testify as to Livingston's statements to her as foundation for his testimony. When Livingston refused to testify substantively, the record does not indicate that defense counsel requested permission to testify herself. Thus, in the absence of an offer of proof, no error can be found.

■ Denton also argues that the trial court erred in not permitting defense counsel to ask Walker about his statements to Livingston, even in the absence of Livingston's testimony. We hold that the trial court properly denied defense counsel the opportunity to recall Walker. Defense counsel wanted to ask Walker whether he had admitted to Livingston that he (Walker) had used an electrical cord when he had assaulted Denton, and whether he had admitted to Livingston that he sent two of his friends out after Denton. Asking these questions would have permitted defense counsel to, in effect, testify to facts that were not already in evidence. Counsel is not permitted to impart to the jury his or her own personal knowledge about an issue in the case under the guise of either direct or cross examination when such information is not otherwise admitted as evidence. *See State v. Yoakum*, 37 Wn.2d 137, 222 P.2d 181 (1950).

### STATEMENTS MADE TO DETECTIVE STRIEDINGER

In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), the United States Supreme Court held that the prosecution could not use inculpatory statements stemming from custodial interrogation of a defendant without first showing that the defendant was fully advised of his privilege against self–incrimination and of his right to counsel, and that the defendant had knowingly, voluntarily, and intelligently waived those rights. *Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, at 444.

Denton argues that Striedinger's failure to readvise him of his *Miranda* rights, along with the fact that interrogation took place in the absence of counsel after Denton had requested counsel, violated his Fifth Amendment rights. The threshold question is whether Denton was in fact subjected to custodial interrogation, to trigger the protections outlined in *Miranda.*

■ There is certainly no question that Denton had been taken into custody at the time he telephoned Striedinger. However, the conversation between Denton and Striedinger did not carry with it the coercive and intimidating factors that are normally present in jailhouse interrogations and that the *Miranda* Court sought to guard against. Striedinger was not physically present, and Denton was free to terminate the conversation at any time simply by hanging up the telephone. Denton's right to do so may be compared to the right of one being questioned by the police who is free to leave at any time. *Cf. State v. Hamilton,* 47 Wn. App. 15, 733 P.2d 580 (1987). Therefore, for purposes of *Miranda* warnings, we believe that Denton was not "in custody."

However, Striedinger also did not violate the requirements of *Miranda* because he did not engage in interrogation initiated by a law enforcement officer. In *Rhode Island v. Innis,* 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980), the Supreme Court stated that *Miranda* safeguards become operable "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Innis,* at 300–01. In addition, the *Innis* Court stated that "interrogation" includes:

> not only . . . express questioning, but also . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

(Footnote omitted.) *Innis,* at 301. Asking a suspect whether he committed a crime is interrogation. *State v. Sargent,* 111 Wn.2d 641, 762 P.2d 1127 (1988).

Thus, Striedinger's questions to Denton were interrogation. Because Denton had been given his *Miranda* warnings at the time he was arrested, such interrogation would ordinarily have been permissible. However, Denton invoked his right to counsel at the time he was arrested. Thus, no further interrogation should have occurred in the absence of counsel unless Denton waived his right to counsel. *Miranda,* at 474.

■ In *Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), the Supreme Court held that once a suspect invokes his right to counsel, a valid waiver of that right cannot be shown merely by the fact that the suspect "responded to further police–initiated custodial interrogation even if [the suspect] has been advised of his rights." *Edwards,* at 484. Rather, the *Edwards* Court held that there can be no further interrogation under that circumstance, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards,* at 485.

This rule was later restated by the Court in *Wyrick v. Fields,* 459 U.S. 42, 74 L. Ed. 2d 214, 103 S. Ct. 394 (1982). In that case, the Court held that no further interrogation can occur in the absence of counsel once the right to counsel is invoked unless it can be shown that "the suspect himself initiates dialogue with the authorities." *Wyrick,* at 46.

In *Oregon v. Bradshaw,* 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983), the Court noted that even if the accused initiates a conversation, if reinterrogation follows, the burden is still on the prosecution to show a valid waiver of the Fifth Amendment right to counsel. *Bradshaw,* at 1044. The Court went on to explain what constitutes initiation:

> There are some inquiries . . . that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to

routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in *Edwards*.

*Bradshaw,* at 1045.

Here, Denton initiated the conversation with Striedinger within the meaning of *Edwards,* such that he validly waived his Fifth Amendment right to counsel. Obviously, Denton initiated the telephone call to Striedinger. In addition, the conversation showed a willingness "to open up a more generalized discussion relating . . . to the investigation". *Bradshaw,* at 1045. Denton had apparently previously left a message for Striedinger to call him in the King County Jail. When he called again, Striedinger naturally asked him if he was calling from jail, to which Denton responded affirmatively. Striedinger then asked Denton, apparently in jest, "[W]hat did you do, hold up a Seven–Eleven?" At this point, Denton denied that, and told Striedinger that it was a bank robbery.

This statement by Denton showed a willingness on his part to discuss the crime of which he was accused. Denton could easily have deflected Striedinger's sarcastic question with an offhand remark, but he chose to tell Striedinger about the circumstances of the robbery instead. We find that such remarks from Denton constituted a waiver of his right to counsel.

Judgment affirmed.

COLEMAN, C.J., and FORREST, J., concur.