THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80669-6-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MICHAEL DAVID SMITH, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Michael Smith appeals his conviction for malicious mischief and the domestic violence assault of his former girlfriend, Tanya Hedin. He argues the trial court erred in denying his motion for a mistrial for jury misconduct. He also contends his malicious mischief conviction should be vacated because the trial court did not provide a unanimity instruction and the State failed to adequately elect in its closing argument the specific acts it claimed comprised malicious mischief. Lastly, he maintains the trial court erred in denying his motion to suppress incriminating statements he made to Hedin during a recorded jail phone call. We reverse the malicious mischief conviction under State v. Petrich,[1] but otherwise affirm.

---

[1] 101 Wn.2d 566, 572, 683 P.2d 173 (1984).

Citations and pin cites are based on the Westlaw online version of the cited material.

<u>FACTS</u>

At the time of trial, Michael Smith and Tanya Hedin had been in a relationship for seven years and have a son together. They lived in Lake Stevens, Washington with their son and two daughters, one each from previous relationships. In 2017, Jonathan Missroon, who lived down the road from Hedin and Smith, began calling and texting Hedin regularly, leading Smith to harbor suspicions that the two were having an affair.

On the afternoon of October 27, 2017, Hedin told Smith she was going to a tanning appointment, but instead met with Missroon at nearby Lake Stevens Community Park so that Missroon could change a taillight on her Dodge pickup truck. Missroon arrived on a motorcycle after Hedin, parked next to her pickup, and changed her rear light within minutes.

Smith learned of Hedin's whereabouts from her teenage daughter. He raced his white Chevy truck to the park and found Missroon and Hedin together. Hedin heard Smith arriving and described his driving as erratic and fast. Other eye witnesses described hearing Smith "peeling out" or "squealing tires," traveling so fast that the truck came off the parking lot speed bumps.

Smith skidded to a stop behind Hedin's truck, leaving skid marks seven to eight feet long. He got out of his truck, began screaming profanities at Hedin and Missroon, and then threw a water bottle at Missroon's head. Smith returned to his vehicle, put the truck in gear, lined his truck up with the rear of Hedin's vehicle, and then slammed the truck into reverse and smashed into Hedin's pickup. According to both Hedin and Missroon, Smith stopped and looked at them before

speeding out of the park. Eye witnesses also described Smith as ramming into Hedin's parked truck. The impact caused Hedin, who was getting into the driver's seat of the pickup, to fall to the ground, leaving her scratched and bruised.

Two witnesses who saw and heard the collision, called the police. Sergeant Josh Pettibone, with the Snohomish County Sheriff's Office, was dispatched to the park at 4:17 p.m. At the same time, Deputy Sheriff Karl Gilje went to the home Hedin and Smith shared. Gilje arrived at 4:30 p.m. and found Smith sitting outside the house distraught and drinking a soda. Gilje arrested Smith.

When Hedin returned to the house that evening, she noticed that her home office, located in the couple's detached garage, had been ransacked and her embroidery machine and computer equipment destroyed. Kerry Baker, who repairs embroidery machines, testified that the required replacement parts for that machine would cost $2,500. In addition to the embroidery machine, Hedin found a shattered computer screen, a damaged laptop and a severed electrical cord to a copy machine. Hedin also found water-damaged computer hard drives outside in the yard. Hedin called police to report the damage at about 8:30 p.m. Deputy Sheriff Todd Thorpe responded and photographed the office area and damaged equipment.

While Thorpe was at the house, Smith called Hedin from jail. Thorpe instructed her to answer the call and "[a]sk him why he did it." When Hedin asked "why . . . you broke my Toshiba laptop," Smith responded "because I was pissed." Thorpe recorded this call on his cell phone, but deleted the recording after

speaking to his supervisor. The jail, however, recorded the call and the court admitted it at trial.

The State charged Smith with domestic violence second degree assault with a deadly weapon, and domestic violence second degree malicious mischief. The jury convicted Smith as charged. The court sentenced Smith to a standard range sentence of 9 months on the assault and 5 months for malicious mischief.

ANALYSIS

A.    Jury Unanimity

Smith asks this court to vacate his malicious mischief conviction because his right to a unanimous verdict was violated. We agree.

In Washington, a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed. State v. Stephens, 93 Wn.2d 186, 190, 607 P.2d 304 (1980).

> When the evidence indicates that several distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct, jury unanimity must be protected. . . . The State may, in its discretion, elect the act upon which it will rely for conviction. Alternatively, if the jury is instructed that all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, a unanimous verdict on one criminal act will be assured. When the State chooses not to elect, this jury instruction must be given to ensure the jury's understanding of the unanimity requirement.

Petrich, 101 Wn.2d at 572. Where there is neither an election nor a unanimity instruction in a multiple acts case, a constitutional error occurs. State v. Coleman, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007). The error stems from the possibility that some jurors may have relied on one act as the basis for convicting the defendant and other jurors may have relied on a different act, resulting in a lack of

unanimity on all of the elements necessary for a valid conviction. State v. Kitchen, 110 Wn.2d 403, 411, 756 P.2d 105 (1988).

The State charged Smith with malicious mischief in the second degree under RCW 9A.48.080(1)(a). This statute makes it a crime to "knowingly and maliciously" cause "physical damage to the property of another in an amount exceeding seven hundred fifty dollars." Before trial, the State notified the court it intended to rely on the damage Smith allegedly caused to Hedin's truck and to her personal property at the house to support the malicious mischief charge. The State also informed the trial court it intended to propose a Pretrich instruction[2] to ensure jury unanimity on that charge. At some point during trial, however, the State decided not to offer a Pretrich instruction. The jury was thus not instructed that it had to unanimously agree on the same act of property damage to render a guilty verdict.

In response to this appeal, the State contends the damage to Hedin's truck and to the personal property located in her house constituted a continuing course of conduct, eliminating the need for a unanimity instruction. This argument lacks merit.

First, the State did not raise this argument below. When Smith moved to dismiss the malicious mischief conviction, arguing that the lack of a unanimity instruction rendered that conviction invalid, the State argued only that the evidence

---

[2] The Washington State Supreme Court Committee on Jury Instructions has developed a pattern jury instruction for the situation in which a defendant is alleged to have committed several distinct acts that could constitute a crime and the State charges that defendant with only one count of criminal conduct. See 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.25 at 117 (4th ed. 2016).

it presented and its closing argument made clear that it had elected to rely only on damage to the personal property at the house. The State did not argue that a Petrich instruction was unnecessary because Smith's conduct constituted a continuing course of conduct, and the trial court did not address this issue. As the State is well aware, a party generally may not raise an argument on appeal that they did not make to the trial court. RAP 2.5(a); State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

Second, while Petrich does not apply if the evidence shows a continuing course of criminal conduct, State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989), the record here does not support this argument. "A continuing course of conduct requires an ongoing enterprise with a single objective." State v. Love, 80 Wn. App. 357, 361, 908 P.2d 395 (1996). We evaluate the evidence in a commonsense manner considering the time that elapsed between the criminal acts and whether the acts involved the same parties, same location, and the same ultimate purpose. Id. Where evidence involves conduct at different times and places, or different victims, then the evidence tends to show several distinct acts. Id. at 362. Conversely, evidence that a defendant engaged in a series of actions intended to secure the same objective indicates a continuing course of conduct. State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995).

In this case, the State admitted below that Smith's actions at the park and at the residence were "separate and distinct conduct at a different location[s], at a different time[s]." The State now contends, however, that the acts were a continuing course of conduct because Hedin was the victim of both acts and they

occurred within roughly 30 minutes.

But the evidence of a continuing course of conduct ends there. The damage to Hedin's truck occurred in a public park in close proximity to Hedin and Missroon. Smith was convicted of second degree assault for the same act, meaning the jury found he had intended to inflict bodily harm upon Hedin when he rammed her truck. Smith then drove to a separate location, the couple's home, and allegedly engaged in a second criminal act, the destruction of Hedin's personal property, which she did not discover until four hours later. These actions constitute separate and distinct acts, one with the objective to assault Hedin, and the other with the objective of destroying her property outside of her presence.

The State alternatively argues, as it did below, that "no unanimity instruction was required because the prosecutor clearly elected the damage to the property at home as the basis for the malicious mischief charge." But the prosecutor made no such clear election.

Courts consider several factors when determining whether the State elected a specific act, including the charging document, the evidence, the instructions, and its closing argument. State v. Kier, 164 Wn.2d 798, 813, 194 P.3d 212 (2008). When the State chooses to rely on a statement made in closing, the prosecution must clearly identify the act upon which the charge is based. State v. Thompson, 169 Wn. App. 436, 474-75, 290 P.3d 996 (2012).

Here, neither the information nor the jury instruction on malicious mischief specified the act that served as the basis for the charge. The State simply alleged that the crime occurred "on or about October 27, 2017." In closing argument, the

prosecuting attorney discussed the damage to Hedin's property at the couple's home when she outlined the elements of the malicious mischief charge and the evidence supporting those elements. But the prosecutor did not explicitly state that the charge was based only on that property damage. Nor did the prosecutor inform the jury that it could not rely on damage to Hedin's truck in rendering its verdict.

The State cites State v. Lee, 12 Wn. App. 2d 378, 394-95, 460 P.3d 701 (2020), to support its argument that the statements made in closing constituted a sufficiently clear election. In that case, the State charged Lee with two counts of assault based on his repeated acts of strangling a single victim in her apartment. Id. at 385. The prosecutor in Lee explicitly stated that the two counts were for "separate and distinct acts . . . one of the counts of assault in the second degree is for the strangulation events that occurred in the living area. And one of the strangulation counts is specifically for . . . the strangulation that occurred in the bedroom." Id. This case is distinguishable because, unlike in Lee, the prosecution never told the jury that it had to consider only the act of property destruction at the home when evaluating the malicious mischief charge.

The State also cites State v. Thompson, in which we held that no Petrich instruction was required where the charged criminal act could have applied to multiple victims and the prosecutor only discussed one victim in closing argument. 169 Wn. App at 475. But in that case the jury instructions specified the elected criminal act by clearly identifying the intended victim. Id. at 474-75. The jury instructions in this case did not identify the property Smith allegedly maliciously

damaged.

Without an instruction or a clear oral statement by the prosecutor in closing, there is nothing in the record to indicate that the jury unanimously found Smith guilty of malicious mischief based on the destruction of property at the house alone, and the danger that the verdict violated Smith's right to jury unanimity remains high.

The State's evidence that Smith damaged Hedin's truck was significantly stronger than the evidence that he damaged her property at the house. The State presented eyewitness testimony of four witnesses in the park who observed Smith ram into Hedin's truck. The State presented several photographs of the damaged truck during trial. On the other hand, no one observed Smith destroy the property at the house, and the State relied primarily on Hedin's account of what she observed when she returned to the house as evidence of this act. It remains highly plausible that members of the jury, dissatisfied with this evidence, also relied on Smith's actions at the park in finding him guilty of malicious mischief.

Because the trial court did not offer a Petrich instruction and the State did not clearly elect which criminal act on which it relied for the crime, Smith was denied his right to a unanimous jury. This error was not harmless[3] and we therefore reverse his conviction for malicious mischief.

---

[3] The State did not argue that the error in not giving a unanimity instruction was harmless. We note, however, that failure to instruct on jury unanimity is harmless beyond a reasonable doubt only if no reasonable juror could have a reasonable doubt as to any of the incidents alleged. State v. Coleman, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007). The State's evidence of the malicious mischief charge does not meet that standard here.

B.      Jury Misconduct

Smith next argues that the trial court denied his right to an impartial jury when it denied his motions for a mistrial and new trial following what he characterizes as premature jury deliberations.  We disagree.  Although the record supports the conclusion that at least a few jurors engaged in misconduct, the trial court did not abuse its discretion in denying the motions after questioning all of the jurors individually and concluding that any misconduct did not prejudice Smith.

We review a trial court's denial of a motion for mistrial or new trial based on alleged juror misconduct for abuse of discretion.  State v. Balisok, 123 Wn.2d 114, 117, 866 P.2d 631 (1994).

During trial, the court removed the jury from the courtroom 14 times during the first two days of trial to address objections to witness testimony or proffered exhibits.  On the second day of trial, the court informed the parties that a clerk had observed a "tally" system on the jury room whiteboard that corresponded with the number of times the jurors had been removed from the court room.  The court had the jurors removed from the jury room and court staff took a picture of the whiteboard.  The left side of the board contained the heading "Recess tally 9/18," under which there were several tally marks.  On the right side of the board, under the heading "9/19," there were two categories, one labeled "Def." and one, "State." The "State" category contained four tally marks, and the "Def.," none.

The court also informed the parties that when the clerk escorted the jurors out of the room, Juror 12 stated "[t]hat's our recess tally, including the reasons why."  The court then questioned each juror individually regarding how the tally

- 10 -

came about and the reasons for it. Juror 12 stated that the tally system was his idea and that the marks for "State" or "Def." indicated which side was examining a witness at the time the jurors were excused. He also stated there was a "general consensus" of frustration among jurors with the number of times they were sent out of the courtroom.

Jurors 11, 10, and 9, separately indicated that the tally system was just meant to pass the time and they were unclear as to the significance of any recess being attributed to the State or defense. Jurors 8, 7, 6, 3 and 1 expressed frustration with the number of times they were sent out of the courtroom. Juror 5 said the jurors had several conversations speculating why they were being removed from the courtroom. At some point before the lunch recess, Juror 12 added a "Judge" category to the board and added a tally mark under that column.

Smith moved for a mistrial the next morning. Despite expressing concern about the jurors' "ability . . . and . . . willingness to follow instructions," the court denied the motion. The court instead instructed the jury not to "make any assumptions or draw any conclusions based on a lawyers' objections," and not to "discuss anything about what happens in this courtroom amongst yourselves until the case has concluded." The court then individually questioned each juror a second time, asking if the number of recesses the court had called had biased them in any way. The jurors all answered "no."

Following the verdict, Smith moved for a new trial under CrR 7.5. The court denied this motion, reasoning that there was no evidence that the jury had

engaged in premature deliberations on the facts of the case or of Smith's guilt or innocence. Smith challenges this ruling.

The Washington Constitution provides, "The right of trial by jury shall remain inviolate." Const. art. I, § 21. "The right of trial by jury means a trial by an unbiased and unprejudiced jury, free of disqualifying jury misconduct." State v. Tigano, 63 Wn. App. 336, 341, 818 P.2d 1369 (1991). Appellate courts are generally reluctant to inquire into how a jury arrives at its verdict and therefore an affirmative showing of misconduct is necessary in order to overcome the policy favoring stable verdicts and "the secret, frank and free discussion of the evidence by the jury." Balisok, 123 Wn.2d at 117-18.

"The party alleging juror misconduct has the burden to show that misconduct occurred." State v. Earl, 142 Wn. App. 768, 774, 177 P.3d 132 (2008). A successful motion for a new trial requires a showing of prejudice. State v. Depaz, 165 Wn.2d 842, 856, 204 P.3d 217 (2009). Only errors that may have affected the outcome of the trial are prejudicial. State v. Gilcrist, 91 Wn.2d 603, 612, 590 P.2d 809 (1979). "While prejudice may be presumed upon a showing of misconduct, that presumption can be overcome by an adequate showing that the misconduct did not affect the deliberations." Depaz, 165 Wn.2d at 856.

"When asking whether prejudice occurred . . . . [t]he question is whether the [juror misconduct] could have affected the jury's determinations, not whether it actually did." Tigano, 63 Wn. App. 336 at 341. This requires a comparison of the misconduct with the particular facts and circumstances of the trial. Id. at 342. "As

- 12 -

a neutral, trained person observing both the verbal and nonverbal features of the trial, the trial judge is in the best position to make this comparison." Id.

In this case, before the court learned about the tally board, the court instructed the jurors that they were not to discuss the case amongst themselves until deliberation. The court also instructed that they were not to draw any conclusions based on any lawyer's objections. The record shows that at least a few jurors violated these instructions when they discussed amongst themselves both the number of objections and the possible reasons for the court removing jurors from the courtroom to address these evidentiary objections.

When asked why there was a separate column for defense and prosecution, Juror 12, the tally's author, stated that the purpose was "[t]o see if there was—if it appeared to us that we were getting sent into recess more often when the prosecution was examining versus when the Defense was examining." Jurors 7 and 8 indicated that there was conversation concerning which party caused the jury to be excused, as indicated by the tally marks. Juror 5 stated that the jurors had several conversations speculating as to the reasons for each recess.

Smith argues the jurors' misconduct must be presumed prejudicial and the State failed to demonstrate the misconduct did not affect the verdict. But the misconduct at issue here does not cut against either party in particular. Prejudice cannot be presumed where the prejudicial effect of the misconduct cuts both ways. Depaz, 165 Wn.2d at 857. If anything, the record suggests that the misconduct biased the jury against the State. Juror 12's statement indicated that some of the jurors might have believed the prosecution had caused the majority of the

recesses. Moreover, when the court clerk took the photo of the tally board before the jurors had been questioned, the board contained four tally marks attributed to the State, one to the judge, and none to the defense. This evidence suggest that the jury's misconduct did not result in prejudice against Smith.

Even if we were to presume prejudice, the record adequately demonstrates that the misconduct did not affect jury deliberations. After becoming aware of the tally, the court immediately removed the jurors from the jury room and thoroughly questioned each of them individually, inquiring into the meaning of the tally marks, the circumstances behind its creation, and the impact, if any, on their ability to remain impartial. The jurors universally informed the court that the board was meaningless and would not impact their substantive deliberations. The trial court denied the motion for a mistrial, finding the misconduct was not serious enough to be potentially prejudicial. The court then admonished the jury and instructed that they "[d]o not make any assumptions or draw any conclusions based on a lawyer's objections," and "must not discuss anything about what happens in [the] courtroom amongst [themselves] until the case has concluded." Under these circumstances, the trial court did not abuse its discretion in denying the motion for a mistrial and subsequent motion for a new trial.

C.    Admission of Self-Incriminating Statements

Smith finally argues that the trial court erred in refusing to suppress the recording of his October 27, 2019 jail phone call to Hedin, resulting in the deprivation of his right to counsel and against self-incrimination under the Fifth and Sixth Amendments to the United States Constitution and CrR 3.1(b)(1). We reject

this argument.

The trial court here admitted several statements Smith made before his arrest. A few minutes after Smith left the park, he sent Hedin a profanity-laced text stating that "[b]acking into you was an accident. I was extremely pissed off and trying to turn around, but you can still go to hell." The court admitted this text message at trial. When Deputy Gilje arrived at Smith's home to investigate the park incident, Smith told him he had gone to the park to look for Hedin, saw her hugging Missroon, became angry, threw a water bottle at a container next to Missroon's motorcycle, and accidentally backed into Hedin's truck. The court also admitted these statements at trial.

Finally, the jury heard about a phone call Smith made to Hedin from the jail on the evening of his arrest. Hedin testified she had received repeated calls from Smith, but at the instruction of Deputy Thorpe, answered one call and asked Smith "why he did it." According to Deputy Thorpe, the subject of the call was the property damage within the detached garage. Patricia Pendry, the records and data management supervisor from the jail, testified about a recorded call Smith made to Hedin at 9:22 pm on October 27. During the jail call, Hedin asked Smith "why . . . you broke my Toshiba laptop," to which Smith responded "because I was pissed." Also during this call, Smith repeatedly denied damaging Hedin's embroidery machine and insisted he had not intentionally reversed into Hedin's truck. This recorded call was played for the jury.

Before trial, Smith moved to suppress any testimony relating to this jail phone call. He argued that while Hedin's questions produced mostly denials, one

response—the statement about being "pissed"—could be interpreted as incriminating. He contended the State violated his right to counsel and to remain silent by using Hedin to interrogate him about his actions after he invoked his Miranda[4] rights.

The court conducted a CrR 3.5 hearing and found Smith had invoked his right to counsel and to remain silent when he was arrested. The court also found that when Hedin answered Smith's call from the jail, Hedin was "acting as a state agent" for the "express purpose of asking a specific question about the defendant committing alleged crimes that the deputy directed her to ask." The court concluded, however, that the statements in the phone call were admissible because Smith was not "in custody" for purposes of Miranda and CrR 3.1 under Illinois v. Perkins, 496 U.S. 292, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990). It concluded the jail recording was admissible and denied the motion to suppress.

When considering the denial of a motion to suppress evidence, we review the trial court's findings of fact for substantial evidence and its conclusions of law de novo. State v. Russell, 180 Wn.2d 860, 866-67, 330 P.3d 151 (2014); State v. Fuentes, 183 Wn.2d 149, 157, 352 P.3d 152 (2015). Unchallenged findings of fact are verities on appeal. State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006).

Smith argues the State violated his Fifth and Sixth Amendment rights to counsel by enlisting Hedin to interrogate him without counsel present.[5] Under the

---

[4] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] The State argues that Smith may not raise a Sixth Amendment claim for the first time on appeal. But we conclude Smith raised this issue below. Although he did not cite the Sixth Amendment, Smith asserted that Deputy Thorpe's actions in instructing Hedin to ask him why he did it violated his right to counsel. CP 178; RP 23. This is the same argument Smith raises on appeal. RAP 2.5 does not prohibit this court from considering new authorities on appeal. Burien Town Square

Sixth Amendment, once a defendant's right to counsel attaches, an undisclosed government agent may not "deliberately elicit[]" incriminating statements from the defendant. Massiah v. U.S., 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). This right, however, attaches only after the State files formal charges. Kirby v. Illinois, 406 U.S. 682, 689-90, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972). Smith called Hedin from the jail after he was arrested but before he was formally charged with any crime. Because no judicial proceedings had been initiated against Smith at the time he called Hedin, his Sixth Amendment right to counsel had not attached. State v. Templeton, 148 Wn.2d 193, 219, 59 P.3d 632 (2002).

Smith contends that under CrR 3.1(b)(1), even though not formally charged, his Sixth Amendment right to counsel attached when he was arrested. This court rule provides that the right to counsel "accrue[s] as soon as feasible after the defendant is taken into custody, appears before a committing magistrate, or is formally charged, whichever occurs earliest." Our Supreme Court has held that the rule's requirement "goes beyond the constitutional requirements to the [F]ifth and [S]ixth [A]mendments of the United States Constitution." Templeton, 148 Wn.2d at 218. But no Washington court has held that a violation of CrR 3.1(b)(1) constitutes a violation of the Sixth Amendment, requiring exclusion of evidence. We decline to so hold here.

Smith next maintains the State violated his right to counsel under the Fifth Amendment because Hedin's questions constituted a custodial interrogation. Under Miranda, an accused has a Fifth Amendment right to counsel during a

Condo. Ass'n v. Burien Town Square Parcel 1, LLC, 3 Wn. App. 2d 571, 576 n. 16, 416 P.3d 1286 (2018).

- 17 -

custodial interrogation, even if no formal charges have been filed. State v. Earls, 116 Wn.2d 364, 374, 805 P.2d 211 (1991). And when an accused invokes the right to an attorney and the right to remain silent, law enforcement may not subject the accused to further interrogation until counsel has been made available or the accused waives his rights. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

Our courts have recognized that not all attempts to question an accused about his crimes while in jail constitute a "custodial interrogation" for Fifth Amendment purposes. In Illinois v. Perkins, for example, the United States Supreme Court held that a police investigation tactic of placing an undercover officer in the accused's jail cell posing as a fellow inmate and asking the defendant questions about the crime did not constitute a custodial interrogation requiring the officer to give Miranda warnings to the suspect. 496 U.S. at 298.

Here, Smith called Hedin from jail, after informing law enforcement he wanted to speak to counsel. Yet, he nevertheless responded to her questions about the crimes he was alleged to have committed. The most analogous case in Washington is State v. Denton, 58 Wn. App. 251, 792 P.2d 537 (1990). In that case, a defendant, accused of committing a bank robbery, used the jail phone to call a detective he knew from a prior case in which he was the victim of an assault. Id. at 253. During this call, Denton told the detective why he was in jail, leading the detective to ask Denton, jokingly, "did you do it?" Denton responded, "I was there." Id. Denton argued the phone call should be suppressed as a violation of his right not to be questioned by law enforcement after invoking his Miranda rights.

- 18 -

Id. at 257. This Court rejected Denton's argument because, although Denton was in custody when he phoned the detective, he was not subjected to a custodial interrogation and was not "in custody" for purposes of Miranda. Id. at 258.

Denton is instructive here because the determinative factors in that case were the fact that Denton initiated the telephone contact, the conversation did not "carry with it the coercive and intimidating factors that are normally present in jailhouse interrogations," the detective was not physically present, and Denton was free to terminate the conversation at any time "simply by hanging up the phone." Id. This case is analogous. Smith reached out to Hedin, not the other way around. The conversation was neither coercive nor intimidating to Smith. Although a deputy was listening to Hedin's end of the call, Smith was not aware there was a law enforcement officer present. And Smith could have simply hung up rather than answer any questions Hedin posed. We conclude Smith was not "in custody" for Fifth Amendment purposes when he chose to call Hedin from jail. The trial court did not err in admitting the jail phone recording.

We affirm Smith's conviction for assault in the second degree and reverse his conviction for malicious mischief. We remand to the trial court for further proceedings consistent with this opinion.

_Andrus, A.C.J._

WE CONCUR:

_Smith, J._                    _Appelwick, J._